## JAMES BURRELL AND ANOTHER V. THE STATE.

The Statute makes no provision for a third continuance ; and whether it shall be granted or not must rest in the sound discretion of the Court. It would require a strong case to warrant the control of that discretion, by this Court.

Where a person who had been summoned upon a special *venire*, in a capital case, being sworn upon his *voir dire*, said he had some impressions from conversing with Bell, a witness for the State, but that he had no opinion, only from rumor ; this Court remarked that it appeared from the statement of facts that Bell's testimony was not important ; that it did not appear that the juror had formed such an opinion, even if he had expressed it, as would disqualify him ; but, if he was incompetent, he did not sit upon the trial, being challenged by the defendant peremptorily ; and it did not appear that defendant exhausted his peremptory challenges.

Where a challenge of a juror, for cause, is overruled, and the juror is then challenged peremptorily, this Court will not revise the overruling of the challenge for cause, unless it appear that the defendant exhausted his peremptory challenges before a jury was obtained.

Where a person who had been summoned on a special *venire*, in a capital case, being sworn upon his *voir dire*, stated that he had conscientious scruples about the infliction of capital punishment, that his scruples would influence his verdict, though he believed men might sometimes be rightly hung, it was held that the State's challenge for cause was properly sustained.

Where the credit of a witness has been impeached by proof that he made a statement to a witness, contrary to what he had testified to on the trial, it is competent to admit evidence of his general good character for truth and veracity.

This case comes clearly within the well settled rule respecting the admissions of such declarations, (dying declarations.)

It has been uniformly held that the admission of evidence of dying declarations does not infringe the constitutional right of a person accused of crime, to be confronted with the witnesses against him.

Although a man be present whilst a felony is committed, if he take no part in it, and do not act in concert with those who committed it, he will not be a principal merely because he did not endeavor to prevent the felony or apprehend the felon. Whether he was aware of the intention of his companion

and participated in it, is the fact to be proved, in order to implicate him in the criminality of the act.

But his presence and companionship, and his conduct at and before and after the commission of the act, were circumstances from which the main fact of his participancy in the criminal intention and design of his companion might be inferred.

It is the province of the Judge to determine when there is or is not *any* evidence as to a certain fact; it is therefore not error to refuse to instruct the jury, that if they believe there is no evidence of a certain fact, they must acquit the defendant, when there is some evidence of such fact.

The circumstances which will amount to sufficient proof of a disputed fact, can never be previously defined. The only legal test of which they are susceptible, is their sufficiency to satisfy the mind and conscience of the jury.

Instructions to the jury, asked by a party, should not be presented in the form of abstract propositions, but should be constructed upon the evidence in the particular case, leaving the fact to the jury.

Where there was positive evidence that the fatal wound was inflicted by one of the defendants, and there was no positive proof that his companion, the other defendant, was aware of his intention, or that he committed any overt act, this Court reversed the judgment, as to the one defendant, on the ground that the Court below did not distinctly inform the jury that if they should find the one guilty, the fact to be found as to the other would still be, whether he was aware of his companion's design and participated in it; the circumstantial evidence not being of a conclusive nature, and there being cause to apprehend that said defendant did not have a fair trial.

Appeal from Austin. Tried below before the Hon. Nelson H. Munger.

The appellants, James Burrell and James R. Burns, were indicted on the 8th of November, 1854, for the murder of William Bird. The indictment charged the immediate act of killing upon each, and that the other was present, aiding, &c. The murder was alleged to have been committed on the 15th of August, 1854; and the defendants were in custody. At same Term, the case was continued upon affidavit, drawn as the affidavit of Burrell, but signed by both defendants, and certified as " sworn to and subscribed before me this 11th day of Nov. 1854"—name of Clerk. The ground for continuance was to procure the attendance of George Hervey, Thomas Lub-

bock, Philip Thompson, J. H. Thompson, George Stansbury, Major Kellum, H. McGowen and William R. Baker, all residents of Harris county, to prove said Burrell's good character; the affidavit stated that Burrell was a stranger in Austin county, that he had been confined in prison since the middle of September, that he was unable to employ counsel, and had no counsel assigned him until the meeting of the Court ; also, to procure the attendance of J. H. Kelly, of Victoria county, to prove his conduct in that county (stating it) after the date of the killing ; also to procure the attendance of a witness whose name he had just learned that day, Lawrence Miller, a resident of Austin county, for whom he will immediately cause a subpœna to be issued, by whom he could prove an *alibi ;* that he knew of no other witness by whom the same facts could be proved ; that the application was not made for delay; that he could procure the attendance of said witnesses at next Term of the Court, &c.

At Spring Term, 1855, defendant's filed an affidavit for continuance, on the ground of the absence of the same witnesses, including Lawrence Miller, on account of whose absence the case had been continued at the Term before, and excused their inability to show that they had used due diligence, by the fact that their counsel had been taken suddenly ill and died during the present Term of the Court ; they also made the death of said counsel, and the fact that their present counsel had not had time to prepare their defence, a ground of the application. The case was continued.

Fall Term, 1855, affidavit for a continuance, as follows :

James Burrell, defendant in the above entitled cause, after being duly sworn, says, and subscribes to the same, that he cannot go safely to trial at this Term of the Court, for the want of testimony material to aid him in his defence ; that Lawrence Miller, a resident of this county, and Allevrin Eakhardt of Colorado County are very material witnesses to aid him in his defence ; that due diligence has been used to pro-

cure the attendance of said witnesses ; that it was but a short time since, to-wit ; about the first day of 'September, 1855, by the active and unwearied efforts of his counsel, that they were enabled to find out the residence of said Eakhardt, and to ascertain the materiality of his testimony ; that said Eakhardt has resided in various places since affiant has been confined in the jail of Austin county, not remaining more than a month or a few weeks in a place, so that it was impossible for affiant to ascertain,-until he fixed his residence in Colorado county, where to send a subpœna, and where to send to find him, and ascertain the facts, of which he knew, that were favorable to aid him in his defence ; that a subpœna was issued about the first of September, 1855, to said county of Colorado, which was in ample and sufficient time to have made service of the same, and to have procured the attendance of said witness at this Term ; that defendant does not know why said subpœna has not been duly served and returned, or whether it has been served, and that it is not by his procurement or consent that said witness, Eakhardt, is not now in attendance on said Court. He expects to prove by said Eakhardt that he was more than twenty miles from the place when Bird was killed, at the time of the homicide. He further says that Charles S. Kelly, whose residence is unknown to him, is also a material witness to aid him in his defence ; that a subpœna was duly issued to the county of Victoria, which he knew to be the last residence of said Kelly, and the same was returned not found ; that said Kelly has left the county of Victoria, and although defendant has used all the means in his power, both by his exertions and those of his counsel, to find out the residence of said Kelly, he has failed. He expects to prove by said Kelly, the time he saw him in the town of Victoria, that he was there but a few days after the 1st August, 1854, and was publicly and openly seeking work at his trade as a carpenter in said town ; that he does not know the cause of failure of said testimony, ; and does not know from what other source he can procure the same ; that

he expects to procure the attendance of said witness at the next Term of the District Court for said county of Austin ; that said witness is not absent by the procurement of affiant ; that he does not know of any other source from which said testimony can be obtained. He further swears that he cannot go safely to trial in said case at this Term of the District Court of Austin county for the want of the testimony of Lawrence Miller, who resides near Post Oak Point, in the county of Austin, State of Texas, by whom he can prove, or expects to prove, that affiant was seen by said Miller at the distance of thirty-five miles from the town of San Felipe, in said county of Austin, at 10 o'clock P. M., on the 7th of August, 1854, and at such time as it would have been impossible for him to have killed the deceased Bird, with whose murder affiant is charged; that he used due diligence to procure said testimony, by having a subpœna regularly issued for said witness, on or about the 1st day of September, 1855. The affiant does not know the cause of failure in said testimony ; that the testimony cannot be obtained from any other source ; that he has been confined in the jail of Austin county for more than one year, all, or nearly all intercourse with the world cut off, and he could not pay that attention to the execution of said subpœnas or the procurement of said testimony that he might, had he been free, and that he had to rely solely upon his counsel in the matter, who have informed him that the Clerk of the District Court was required to issue said subpœna about the 1st day of September, 1855, and that the Clerk informed affiant's counsel that said subpœna was duly issued at that time and given to the Sheriff of Austin county, which was all the diligence he could possibly have used in the premises. He further swears that this application is not made for delay, but that justice may be done, and that he expects to procure said testimony at the next Term of the District Court of said Austin county ; that affiant requested his attorneys to have subpœna issued for said Miller, immediately after the adjournment of the Spring Term of

the District Court of said county of Austin, for the year 1855, and that his attorneys, to-wit: Henderson, Lipscomb and Waller, promised affiant faithfully that they would have the same issued for said Miller, and they have since informed affiant that they had the same issued as aforesaid. Affiant further swears that he cannot find said subpœna among the papers of said cause, and does not know what has become of said subpœna; whether the same was executed or not.

Application for continuance overruled. The evidence was as follows:

Hermann B. Tuttle, for the State, testified that on the night of the 7th of August, 1854, he was called to see a man who was shot on the San Felipe and LaGrange road; that he found a man lying on the ground about five or six miles from San Felipe; that the man was in a state of collapse, or nearly so; that he stimulated him, which partially restored him; that he learned that it was Bird who was shot; directed that a carriage be sent for to convey Bird to San Felipe; Bird was not aware where he was shot, that is, in what part of his person; that by reducing the action of the heart, and compressing the carotid artery, the hemorrhage was reduced, which before had been considerable. Bird had received a gunshot wound, the ball entering the left angle of the mouth, taking away two of the lower teeth, cutting about half or two-thirds of the thickness of the ball in the tongue. Told Bird that the motion of the carriage would bring on hemorrhage, and, if it did, he would probably die before they got to San Felipe. Bird remarked that, if he died before John Hill got to him, to tell him who he was, that he had been killed, and to send word to Mr. Bell, and they should know what to do. He waited some two hours until the carriage arrived. After Bird revived he told witness that in coming from town he overtook two men, or they overtook him, witness does not recollect which; that the two men talked like strangers to each other, as though one was a new comer, and the other had been some

time in the country, talked of wild beasts to be met, and joked with each other until they met three wagons ; stopped and took some whiskey ; they then rode on ; this was after night, and as Bird was by the older and the larger of the two men, the younger and smaller riding behind, said " look out Bill, I am going to shoot you," and, as he turned his head, the man fired. Bird's horse then broke in the prairie, and Bird made all speed for the wagons they had passed ; how he came off his horse did not know.   The hemorrhage did not take place in removing Bird to San Felipe.   Secondary hemorrhage took place on the 13th of August ; the skin on the back part of the head near where the ball had lodged became soft and was opened by witness on the 13th, and mattered freely ; that on the same day witness called a physician in consultation to cut out the ball, but in feeling for the same it was pushed back in its track so as to render cutting for it dangerous.   On the 14th hemorrhage was excessive.   Bird died on the 15th, 16th, or 17th of August ; died in Austin county, and died of the gun-shot wound before described.

Cross-examined.   Told Bird he would probably die of hemorrhage if he was removed, and if hemorrhage did not come on in removing him, it would probably come on with the first relapse.   Bird was not aware of his true condition when witness found him on the prairie, but was fully sensible of his condition before he left, and talked sensibly.   Dr. Tuttle told Bird he was liable to die at any moment.   The place where he was, was a public road.

Thomas Ewell, witness for the State, was residing in San Felipe with his mother on the 7th of August, 1854 ; cannot say positively that he saw prisoners on the 7th August, 1854 ; they resemble the men very much that stopped at his mother's on that day.   They came after dinner and left in the evening, after early supper.   Asked one his name ; he replied, in a low tone, Burns, or some such name.   Noticed no particular mark by which he could identify them ; don't know what road they took.   They wore black hats and were dressed in black.

John Hill, witness for the State ; was at San Felipe on the 7th of August, 1854 ; it was election day. In the evening he met two men on the LaGrange and San Felipe road. Also met Bird about a half a mile behind them on the same road, going in the same direction. The two men rode very slow ; Bird rode off in a fast pace. Knows all the citizens about San Felipe. The men he met were not citizens, but strangers to him; he met them about sundown or a little after.

Elizabeth Ewell, witness for the State, said that Burrell and Burns came to her house in San Felipe on the day of the election ; came after dinner was over, called for dinner and to have their horses fed. They got dinner ; called for an early supper. After dinner witness and prisoners were on the gal-lery ; had some conversation with the elder one ; whilst the conversation was going on, Bird, the deceased, came in with a new pair of saddle-bags on his arm ; the older one, Burns, asked Bird if he was about to travel ; he replied that he was; which way are you going? Up the country towards LaGrange. Burns said "we are going that route." Bird said he was going in the morning, but would wait for company, as the road was a lonesome one. Burns said, The weather is very warm, and we are going on late this evening, go with us. Bird said that would suit him and he would go. Burns said, Where will we get together ? Bird said, When you get ready, ride on to Mr. Dashield's and ask for me ; if I am gone, they will tell you ; I will ride slow, and you can overtake me. Burns said, We are going to have an early supper, why not come and take supper with us. Bird answered, I do not wish any supper, and my horse is at Mrs. Dashields ; he then went into the house and got his spurs and observed that he had some business to attend to and went out. She had supper prepared for Burrell and Burns about an hour by sun ; Burns eat supper ; Burrell did not. Burrell said his horse was sick and he was out at the horse lot when supper was ready. After supper Burns paid their bill ; they got their horses and left. She recognises the

prisoners as being the two men that were at her house on the 7th of August, 1854, and who left there as before stated; points them out; shows which is Burrell and which is Burns. About 3 o'clock next morning Bird was brought back to her house wounded; that on several occasions she had conversations with Bird; on the Thursday following Bird said he would die; said he was prepared to die; became very happy and exhorted his friends to meet him in heaven. On the Saturday follow-ing, she asked Bird who shot him; he said James Burrell shot him, and then said come close to me and I will tell you all about it; he said, " We had no quarrel; he, Bird, was riding behind; they said " ride up Bird, don't be afraid;" he rode up; one said, " are you armed ?" " No, I never pack arms." One said, " defend yourself," and as he turned his head Bur-rell shot him, (about seven miles above San Felipe, near the cross timber in Austin county.) Bird died about the 15th of August, 1854. On the Thursday that Bird was so happy, he asked them if they would not believe what a dying man would say. Bird said he told the men he was travelling with, his name; and they told him their names; the names they gave were James Burrell and James Burns. Bird said, when he was shot, he wheeled his horse and ran towards San Felipe and fell off his horse. He said a stream of blood ran out of his mouth when he was shot; said the two men joked each other as if they were strangers; talked about the country as if one of them had just arrived. I know Bird said James Burrell shot him.

James Donivan, for the State, says that one evening, after night, Bird, Burrell and Burns rode up to where he and some other wagoners had stopped on the road from San Felipe to LaGrange, a short distance from San Felipe, on the west side of Bollinger's creek. As they rode up one of them said, " By God! we are some of the boys !" witness said, " By God! there are some of them here too !" Burns and Bird drank some whisky. Burrell did not drink any. Witness knew all

three of the men ; shook hands with all three of them when they started ; did not know when it was ; knows that it was very warm weather ; it was the first trip he made with a wagon ; did not know that it was election day ; thinks, from the fact that he saw part of a bloody shirt in the Brazos bottom next day, that it was about election time. Says the night Burrell, Burns and Bird passed him on the road was a bright moonlight night. About an hour after they passed him, Bird's horse came back without Bird.

Cross-examined : He had known Burns and Burrell before ; saw Burns in Fayetteville and Burrell in Houston. The three rode off from him, joking each other, and apparently very merry ; he had seen them before and knew them when they rode up ; he had no camp-fire. Had never told any person that he did not know Burrell and Burns ; had never told any one that he had never seen Burrell and Burns before the night they rode up to him in the prairie ; had never told John Delano.so.

Randal Foster, for the State : Saw the prisoners at his house on Saturday before the election ; knows that they went by the name of Burrell and Burns when at his house.

James Bell, for the State : Saw the prisoners on the day of the election at Pine Grove, a few miles from San Felipe ; thinks they left there about eleven o'clock.

Woodson F. Washam, for the State : Found Bird lying in the LaGrange road on the night of the election, 1854. Bird was sensible ; knew me ; said he thought he should die ; said Burrell and Burns shot him. It was a bright moonlight night; Burnett Cameron was traveling with witness.

Burnett Cameron, for the State : On the night of the 7th of August, 1854, witness and Wood Washam were coming from San Felipe ; came up to a man lying in the road ; supposed he was drunk ; sat on their horses ; spoke to the man. When Washam spoke, Bird said, " My God ! is that you Wood ? go for the Doctor, will you ?" Washam said yes. Bird asked

for water ; witness gave him some ; he could not drink. Bird was covered with blood ; witness ripped open his coat and shirt ; saw and passed James Donivan about a quarter of a mile nearer San Felipe than the place they found Bird. Bird said, " I shall die, and two men riding with me shot me."

Lawrence Miller, for the State : Was not acquainted with prisoners ; saw one before. (Burns,) not certain about both ; it was in the night.

C. W. Buckley, for the State : Was in San Antonio and held Court there for Judge Devine from 11th to 16th of September, 1854 ; some time from the 11th to the 16th, Burrell and Burns were arrested at the Plaza House, in company, under the name of Burrell and Burns ; Plaza House, bon ton place.

M. G. Montgomery, for the State : Says prisoners were brought to John W. Collin's together in this county ; that their conveyance broke down there, and he hauled prisoners to Bellville, and they were placed in jail by the Sheriff.

John Delano, for defendants : Says that James Donivan told him that he never saw Burrell and Burns before they rode up to him on the prairie with Bird ; told him so last Court at Bellville. Donivan was drunk when he told me so. No one heard the statement but Delano ; he was trying to get Donivan off to bed.

Randall Foster for defence : Said that Burrell had lived at his house a short time, and that he conducted himself very well until the day he left.

B. S. Peel, for the State : Said he had known James Donivan eight or nine years ; would believe him on oath or when Donivan spoke seriously ; that Donivan sometimes gets drunk, and when so, speaks at random.

Nimrod Chappell, for the State : Said he had known James Donivan five or six years ; that he would believe him about as soon as he would anybody.

The Judge instructed the Jury, without request, as follows :

(The first three paragraphs stated the definition, and degrees of murder, in the language of the Statute.)

4th. In this case murder must have been premeditated and deliberate, to constitute the crime of murder in the first degree.

5th. If the deceased was killed under circumstances which amount to murder, if the killing was not premeditated or deliberate, then it is only murder in the second degree.

6th. If one take the life of another, without cause or excuse, with an instrument likely to produce death, it is a premeditated and deliberate killing, and may be murder in the first degree.

7th. Every person of sound memory or discretion, who shall unlawfully aid, abet or instigate the killing of any reasonable creature in being, within this State, with malice aforethought, either express or implied, shall be deemed guilty of murder.

8th. The person who commits a murder, and he who unlawfully aids, abets or instigates it, are equally guilty of murder.

9th. If two persons are present at the commission of a murder, and one commits the deed, and if they are together with a common intent and purpose, and so near as to render assistance if necessary, the one is guilty of murder, and the other of aiding and abetting it, and both are guilty of murder.

10th. Malice is essential to constitute the crime of murder ; malice is either express or implied.

11th. Express malice is where one, with a deliberate intent, kills another with an instrument likely to produce death.

12th. Malice is implied from the commission of any premeditated and deliberate killing, or when the killing was done suddenly without any or without a considerable provocation.

13th. You are to find your verdict from the law and the testimony ; you are the exclusive judges of the testimony, but are to take the law as given you in charge by the Court.

14th. The prisoner is entitled to any reasonable doubt in his favor.

15th. The jury are the judges of the weight of testimony

and the credit to be given to the witnesses; they are to consider the circumstances under which dying declarations are made; what the deceased said, and, if contradictory, to determine the weight due to the declarations. Such declarations to be entitled to credit, must be made in immediate expectation of death.

16th. Circumstantial testimony must tend closely to prove the fact, or it is not, of itself, sufficient, but may still be entitled to great weight in connection with positive testimony.

17th. The jury will determine from the testimony and from all the facts and circumstances; whether one committed the deed, and the other aided and abetted it.

18th. If you find the prisoners or either of them guilty of murder, you will find in your verdict whether it is of the first or second degree.

19th. If of the first degree you will merely 'find, " guilty of murder in the first degree," and the law fixes the penalty to be pronounced by the Court.

20th. If in the second degree, you will find him " guilty of murder in the second degree," and also assess the punishment, which is confinement in the penitentiary, not less than three nor more than fifteen years.

The following instructions were requested by the defendants, and refused :

1st. Circumstantial evidence is always insufficient, when the evidence tends to prove that some other hypothesis may still be true.

2d. In circumstantial evidence it is the actual exclusion of every other supposition, which invests mere circumstances with the force of truth.

3d. If the deceased made different statements as to whether he would die or live after receiving the wounds, the jury will disregard his statements about the murder.

4th. If the deceased made contradictory statements in his dying declarations. the jury are at liberty to disregard them,

they being the sole judges of the amount of credit due to the statements of a witness.

5th. If the jury believe that any other hypothesis but the guilt of the prisoners could be true, it is their duty to acquit.

6th. That in criminal cases, because of the more serious and irreparable nature of the consequences of a wrong decision, the jurors are required to be satisfied beyond any reasonable doubt of the guilt of the accused, or it is their duty to acquit them.

6th. That the deceased must be under the impression of almost immediate dissolution, to admit his declarations to go to the jury as evidence ; and if they believe that Bird had any hope of life, at the time he made the declarations, then it is their duty to disregard his declarations.

7th. That if they believe deceased had, at the time of the declarations, any expectation or hope of recovery, however slight it may have been, it is their duty to disregard his declarations.

8th. If the jury have any reasonable doubt of the identity of these men with those who killed the deceased, it is their duty to acquit.

9th. If the jury do not believe that Burns was privy to the killing, it is their duty to acquit him.

10th. If the statements of Bird in the dying declarations, which were given to the jury were contradictory, they have just as good a right to discredit his testimony as they would the testimony of a witness who was sworn upon the stand, and made contradictory statements.

11th. If the jury believe that prisoners killed the deceased, but killed him without premeditation, that they may be guilty of murder in the second degree, but cannot be guilty of murder in the first degree, and ask the Court to give the law relative to murder in the second degree.

12th. That if the jury believe that there is no evidence in the case, tending to show that the defendant Burns was privy

to the intention of Burrell to kill Bird, (if such intention existed,) or was not aiding, abetting and assisting in said murder, then they must acquit said defendant.

Verdict of guilty of murder in the first degree, as to both defendants. Motion for new trial overruled. Judgment, &c.

There were bills of exceptions as follows :

In organizing the jury, A. J. Cloud was called and sworn to answer questions. He stated that he had conscientious scruples about the infliction of capital punishment ; that his scruples would influence his verdict ; that he believed men might be sometimes rightly hung. The State objected to him for cause, which objection was sustained.

F. Hoffman, called as a juror ; sworn to answer questions ; said he had some impressions from conversing with Bell, a witness for the State ; but he had no opinion, only from rumor. He was made to stand aside till the panel was exhausted : then re-called. The defendants objected to him for cause and the objection was overruled.

The attorneys for the defendants objected to the admission of the testimony of Dr. Tuttle, Mrs. Ewell, Washam and Cameron, as to the dying declarations of the deceased, as inserted in the statement of facts, because there was no sufficient basis to admit such testimony, but the objections were overruled.

B. L. Peel, John Ferrell and Nimrod Chappell were introduced by the State to testify as to the character of James Donovan, as appears in the statement of facts ; the defendants having attempted to impeach the same by the testimony of John Delano ; to the admission of which testimony of Peel, Ferrell and Chappell, the defendants objected, and the objection was overruled ; to all of which rulings the defendant's by their counsel objected, &c.

F. Hoffman's name appeared in the list of jurors returned upon the special venire.

C. W. Buckley, for appellant.   I. It is submitted, in a case

of life and death, whether the application was not sufficient to postpone the trial.

II. The juror F. Hoffman, was not impartial, for his impressions were formed from a conversation with one of the witnesses for the prosecution.

III. The juror A. J. Cloud was competent.

IV. There was no proper legal basis laid to let in the dying declarations of Bird. From the evidence it is apparent that Bird had hopes of living. (1 Phil. Ev., Cowen & Hill's notes, No. 187.) It is submitted whether such evidence is admissible under the Constitution of the State of Texas. (Const. Art. 1, Sec. 9 ; 11 Ga. R. 375.)

V. The evidence of B. L. Peel, Nimrod Chappell and Ferrell was irrelevant and improperly admitted. The character of the witness James Donivan was not in issue. The only issue was whether he had made a different statement out of Court from that made in Court on the trial of this case.

VI. The charges asked of the Court by defendants are undoubtedly clear, and recognized legal propositions, and should have been given to the jury. It is not enough to say that their substance is contained in the charge by the presiding Judge. On the contrary, the defendants had the right to have the charges requested of the Court, so far as the same were pertinent to the facts and law of the case, given in the form required, without change or modification or combination with other legal propositions, calculated to confuse or mislead the jury. (12 Ala. R. 764 ; 7 Humph. R. 542 ; 9 Id. 9, 24 ; 8 Sm. & Marsh. 410.)

VII. The motion for a new trial ought to have been sustained. The verdict is not sustained by the evidence. There is no ground whatever in the record, upon which a verdict of guilty could have been found against defendant Burns. (1 Rus. on Cr. 509.)

*Attorney General*, for appellee.

WHEELER, J.   The law makes no provision for a third continuance; and whether it shall be granted or not must rest in the sound discretion of the Court.   It would require a strong case to warrant the control of that discretion, by this Court. In Hipp v. Huchett, (4 Tex. R. 20,) this Court said, "The 'Legislature has not defined the requisites of a third applica- "tion; and we may well hold, as a general rule, that it is " addressed to the discretion of the Court, to be guided in its "judicious exercise, by the nature of the case, the circumstan- "stances under which the application is made, and the object " to be attained, viz. : a fair, as well as speedy trial of the " cause."   This was a third application to put off the trial, made upon substantially the same grounds as the first.

The defendants had already had two continuances, and ample opportunity afforded them to prepare for trial ; and there was no reason to believe they would be better prepared at another Term, or that the application was made for any other purpose than delay.   One of the witnesses, on account of whose ab- sence the continuance was asked, and whose absence had been the principal ground of the first, and was also a ground of the second application, was present and testified in the case. Under the circumstances the Court very properly refused to grant a further postponement of the trial.

It does not clearly appear that Hoffman was incompetent to sit as a juror.   He did not state that he had formed or ex- pressed an opinion as to the guilt or innocence of the prisoners, but only that he had some impressions from having conversed with the witness Bell (who testified only to the fact of his hav- ing seen the prisoners near San Felipe on the morning of the day of the commission of the homicide) and that he had no opinion only from rumor.   If it is to be taken from his state- ment, that he had formed an opinion as to the guilt or inno- cence of the prisoners, it does not appear that it was such a fixed and settled opinion as would disqualify him to sit as a juror in the case, even though he had given expression to it.

It may have been a mere hypothetical opinion, founded on the supposition that what he had heard was true, which would not incline his mind for or against the prisoner upon hearing the evidence. If such were its character, it would not disqualify the juror. (Whart. Am. Cr. L. 843 to 857.) But, if he was incompetent, he did not sit upon the trial; nor does it appear that the defendants exhausted their challenges. And in McGowen v. The State, (9 Yerger, 184,) where the prisoner challenged the juror for cause, and his objection was overruled by the Court, though the juror was incompetent, and the prisoner afterwards challenged him preremptorily, it was decided, that as the record did not show that the prisoner had not exhausted his preremptory challenges, it was not an error for which the judgment would be reversed. We are of opinion that it does not sufficiently appear that the juror was incompetent to warrant this Court in reversing the judgment on that ground. But if it did so appear, upon the authority of the case cited, it would not be ground of reversal.

The statement of the juror Cloud, that his conscientious scruples respecting capital punishment would influence his verdict, was good cause of challenge. (White v. The State, 16 Tex. R. 206 ; Hyde v. The State, Id. 445 ; Whart. Am. Cr. L. 857.)

When the credit of the witness Donivan had been impeached by proof that he had made a statement to the witness, contrary to what he had testified on the trial, it was competent to admit evidence of his general good character for truth and veracity. (1 Greenl. Ev. Sec. 469.)

It is objected that the Court erred in admitting evidence of the dying declarations of the deceased ; because, it is said, the evidence shows that the deceased had hopes of living, at the time of making them. But we see nothing in the evidence to warrant such an inference. On the contrary, the evidence, we think, shows, very satisfactorily, that the deceased was fully impressed with his true situation, and aware of his approach-

ing dissolution ; and that his statements were made when he had no expectation or hope of recovery, but was under the immediate apprehension of death, or, as it is sometimes expressed, under a sense of impending death. The case comes clearly within the well settled rule respecting the admission of such declarations. (1 Greenl. Ev. Sec. 158 ; Roscoe's Cr. Ev. 30 to 37 ; 1 Phil. Ev. 279, and N. 187, p. 251 of C. & H. Notes Part 1.) It has been uniformly held that the admission of this evidence does not infringe the constitutional right of the accused to be confronted by the witnesses against him. (Bill of Rights, Sec. 8 ; McDaniel v. The State, 8 Sm. & Marsh, 416 ; Anthony v. The State, 1 Meigs, 265.)

There is no error of law in the charge of the Court. Nor is there error in the charge, in its application to the case of the defendant Burrell, or in the refusal of instructions, considered in their relation to the evidence in his case. The only instructions refused which were proper to have been given, and which were not embraced substantially in the charge of the Court, were those which were applicable to the case of the other defendant ; and, except the ninth, those which related to the effect to be given to circumstantial evidence ; or the tests of its sufficiency. But as to the guilt of the defendant Burrell, the evidence was not solely, or mainly circumstantial. It was direct and positive. There was proof positive that he was the voluntary agent who committed the homicide. There was therefore no occasion, in his case, to lay down the law with greater particularity, upon the subject of circumstantial evidence. There is no error in the ruling of the Court in giving or refusing instructions in so far as he is concerned.

But it is not so clear that there is not error both in the refusal of instructions, and in the charge of the Court in reference to the case of the defendant, Burns. If he be guilty, it is as a principal in the second degree, being present aiding and abetting the commission of the homicide. To constitute the crime, of which the evidence tends to convict him, there must

have been a participation, on his part, in the act. If he was cognizant of the intention of his co-defendant, and being present, was consenting, and it was but the carrying out of a common design, he is guilty equally with him who committed the deed ; and upon this subject the general principle is correctly stated in the charge of the Court. But in order to implicate him in the crime, he must have been aware of the intention of his companion to commit it. His bare presence is not sufficient. For " although a man be present whilst a felony is committed, " if he take no part in it, and do not act in concert with those " who committed it, he will not be a principal in the second de- " gree, merely because he did not endeavor to prevent the fel- " ony, or apprehend the felon." (Roscoe Cr. Ev. 213 ; Whart. Am. Cr. L. 6364 ; Whart. L. Homicide, 157.) Whether he was aware of the intention of his companion and participated in it, was the fact to be proved, in order to implicate him in the criminality of the act. That, as to him, was the *factum probandum*, upon the proof of which his conviction must rest. And as to that, the evidence was wholly circumstantial. There was no positive proof that he was aware of the intention of his companion, or that he committed any overt act at the time, manifesting a criminal intention on his part. His presence was not, of itself, sufficient to inculpate him. It was not, *per se*, evidence of guilt, or of any force as proof, only as considered with other circumstances conducing to prove his guilt. It was not the main fact to be proved ; for, of itself, it did not imply any criminality. But his presence and companionship, and his conduct at and before and after the commission of the act, were circumstances from which the main fact of his participancy in the criminal intention and design of his companion was to be inferred. It is plain, therefore, that, as to his guilt, the evidence was wholly circumstantial. Although joined with the other defendant upon the trial, he was entitled to a distinct consideration of the evidence in his case, and to have the law applicable to it given in charge to the jury. All

the instructions asked respecting the legal tests of the suffi-
eiency of circumstantial evidence to warrant a conviction were
refused ; and the charge of the Court did not affirm in any dis-
tinct proposition, or embrace in substance, the instructions re-
fused ; or inform the jury what is the proper test of the suffi-
ciency of such evidence. The fifth and twelfth instructions
were rightly refused ; the former, because not correct in the
abstract ; and the latter, because of the assumption which it
contains, that there was no evidence in the case tending to
show that Burns was privy to the intention of Burrell. The
first and second, though not liable to the same objections, and
though expressed in the language of a learned and philosophi-
cal elementary treatise, were not well adapted to the compre-
hension of a jury ; and we do not hold that it was error to
refuse them, in the form in which they were propounded. Mr.
Starkie and other elementary writers have undertaken to de-
fine, and doubtless have defined with all the precision and ac-
curacy the subject is susceptible of, the tests of the legal suffi-
ciency of circumstantial evidence. But it is finally admitted,
that the circumstances which will amount to sufficient proof of
a disputed fact, can never be previously defined. In their na-
ture they can never be matter of general definition. The only
legal test of which they are susceptible is their sufficiency to
satisfy the mind and conscience of the jury. (1 Greenl. Ev.
Sec. 2 ; 1 Stark. Ev. 514 ; 14 Tex. R. 514.) It may well be
doubted whether the giving of instructions to a jury in the
form in which these were propounded, is ever proper ; for it is
scarcely to be expected that they will readily comprehend and
rightly apply them to the ascertainment of the fact. But in
refusing these instructions it would have been proper, in view
of the fact that the cases of the defendants were distinct, and
that one of them depended solely on circumstantial evidence,
to have instructed the jury as to the law on that subject. It
would certainly have been more satisfactory, if they had been
told that in order to convict upon such evidence, it should satisfy

their mind and consciences, beyond a reasonable doubt, of the
guilt of the accused ; and of what they must be satisfied in
order to find him guilty. But as such instruction was not asked,
we cannot hold the mere omission to give it error. But the
ninth instruction asked is not liable to any objection. It is
manifestly correct in point of law, and not objectionable in
form. It was of vital importance to the defendant Burns,
that the jury should be given to understand, that unless satis-
fied that he was cognizant of the intention of his companion,
and in that sense privy to the killing—that is, privately know-
ing, (which is evidently the sense in which the term privy is
used in the instruction,) it would be their duty to acquit him.
It was the right of the defendant to have the jury so instructed;
and it was what was proposed by asking the instruction in
question. It may have been supposed that the substance of
this instruction was sufficiently implied from the ninth and seven-
teenth propositions given in the charge of the Court. If the
circumstances were of a more conclusive character and tenden-
cy, as they would be, if the evidence had further disclosed a
motive for the commission of the homicide common to both de-
fendants, it might perhaps be held that the charge of the Court
was sufficient. But still, it seems difficult to deny the right of
the defendant to have the distinct affirmation by the Court of a
proposition so evident, and material to his case, as that con-
tained in the ninth charge, which was refused.

But if there is no error in the refusal of instructions, for
which the judgment may be reversed, we think there is such
error in the charge of the Court as respects the case of Burns.
The difference in the cases of the defendants does not appear to
have been kept distinctly in view throughout the charge. The
only instruction given, upon the effect of circumstantial evi-
dence, was that embraced in the sixteenth proposition, that,
" circumstantial testimony must tend closely to prove the fact,
or it is not, of itself, sufficient, but may still be entitled to great
weight in connexion with positive testimony." This was calcu-

lated to produce the belief in the minds of the jury, that the evidence of the defendant's guilt was not wholly circumstantial. The Court evidently so regarded it ; and it was true in reference to the defendant Burrell ; but not in reference to the case of Burns. As to his guilt, the evidence was wholly circumstantial. As the distinction is not elsewhere taken in the charge, the evident tendency of this instruction was to mislead ; and we cannot say that it may not have influenced the verdict of the jury. In a case of life and death especially, there should be no ground to apprehend that the accused had not a fair trial upon the facts of his own particular case. And because there does appear to be ground for such apprehension, we think the defendant Burns ought to have had a new trial, to the end that the question of his individual guilt might be distinctly presented and passed upon by the jury, under a proper application of the law of the case.

Of the sufficiency of the evidence to warrant the conviction of Burrell, there can be no question ; and as to him, there being no error in the judgment, it is affirmed. As to Burns, the judgment is reversed and the case remanded for a new trial.

Ordered accordingly.