## ROY BARTON AND DAVID DUTTON V. STATE

No. 27,605. June 8, 1955
Appellant's Motion for Rehearing Denied
(Without Written Opinion) October 12, 1955

*W. C. Wofford,* Taylor, *Ross Hoffman* and *Aubrey L. Davee,* Brady, and *Morriss, Morriss, Boatright & Lewis,* by *Will A. Morriss, Jr.,* San Antonio, for appellant.

*Raymond Thornton,* District Attorney, Goldthwaite, *J. R. Owen,* County Attorney, Georgetown, and *Leon Douglas,* State's Attorney, Austin, for the State.

MORRISON, Presiding Judge.

The offense is castration; the punishment, five years.

Though separately indicted, the defendants, Barton and Dutton, in accordance with their own motion to consolidate, were tried jointly.

This is the third reported decision by this court under Article 1168, V.A.P.C., which reads as follows:

"Whoever wilfully and maliciously deprives any person of either or both or any part of either or both of the testicles shall be confined in the penitentiary not less than five nor more than fifteen years."

Barton, a 58-year old widower, became infatuated with a Mrs. Daugherty, a somewhat younger widow who resided on a ranch in Mills County. On the morning of July 4, Barton and Dutton, his 46-year old rancher friend, began to drink whisky in a Brady hotel. During the course of the afternoon, they proceeded by automobile to Mrs. Daugherty's ranch, and it was there that the offense occurred.

The defense was temporary insanity induced by the recent voluntary and excessive use of ardent spirits. Each of the appellants testified that he remembered almost nothing of what occurred at Mrs. Daugherty's ranch and did not remember committing any assault on either of the injured parties. It was shown that the appellants had paid the sum of $32,000 to the two injured parties in settlement of their civil liability growing out

of the events of the day. Their good reputation was admitted, but the jury declined to grant their applications for a suspended sentence.

The following is the state's evidence.

We shall summarize Bessie Hosek's testimony: She was living with Mrs. Daugherty at the ranch on the day in question; Sergeants Bennett and Mitchell from Ft. Hood had joined them the night before, and at the time the appellants arrived she and Sergeant Bennett were asleep in different bedrooms. The two appellants came in, asked for Mrs. Daugherty, were informed that she had gone to a tank some distance from the house with Sergeant Mitchell, and this seemed to anger Barton. About this time he noticed Sergeant Bennett asleep and announced that he was "going to cut the s.o.b." She went into the bedroom and saw Dutton holding Sergeant Bennett around the shoulders and Barton standing at the foot of the bed with his pocket knife in his hand trying to hold Bennett's legs down; she attempted to interfere and Barton kicked her away. She ran toward the tank, but the appellants overtook her in their automobile, announced "we cut the guy at the house, and we are going down to the tank to get the other one," and proceeded on in the direction of the tank. A short time thereafter Sergeant Mitchell came on foot to where she was; she went back to the house, procured a shotgun and brought it to Mitchell. She and Mitchell proceeded to the tank, found that the appellants had left, got Mrs. Daugherty, and the three of them returned to the house in Mitchell's automobile. When they arrived at the house Sergeant Bennett was standing on the porch clad only in a T-shirt, and the entire lower portion of his body was covered with blood. Barton was standing there laughing at him. Dutton then started toward their automobile, and Sergeant Mitchell pointed the gun at him and told him to come no further. Barton said, "I have got a gun, too" and entered the house, at which juncture Sergeant Bennett got in the automobile, and the two soldiers left. After this Barton assaulted her and then Mrs. Daugherty, when she tried to intervene, and shortly thereafter the appellants left.

Mrs. Daugherty was the next witness. She stated that she and Sergeant Mitchell were at the tank when the appellants arrived and Barton announced, "I have just cut one s.o.b., and I am fixing to cut another one." Dutton grabbed Mitchell, and Barton began to slash at him with his knife, but Mitchell broke loose from them and ran. The appellants left in their automobile, and Mitchell returned with a shotgun. After they returned to

the house, she heard Barton address Sergeant Bennett as follows: "Haw, haw, you are one cut s.o.b.," and after the soldiers left Barton assaulted her and upon leaving said, "David (Dutton), well, come on; let's go get a gun and we will come back and kill both of the bitches." She stated that she had been keeping company with Barton for over a year and explained their relationship as follows: "He didn't give me so much money; he gave me gifts, but a lot of friends give me gifts." She stated that Miss Hosek was an unwed mother who was staying with her while her child was born.

Dutton had never been to the ranch before and did not know Miss Hosek or that she was there before they arrived at the ranch.

Sergeant Bennett gave the following testimony. He accompanied Sergeant Mitchell to the ranch, and they fished during the morning of July 4. In the afternoon he took a nap and was aroused when Dutton grabbed him around the throat. He saw Barton standing at the foot of the bed with a knife in his hand and heard him say, "Let's cut him, Dave." Barton pulled off the shorts which Bennett was wearing and cut him on the thigh. He was struck in the head and lost consciousness; when he came to he discovered a cut across the scrotal sac and later learned that he had lost his testicle.

Sergeant Mitchell gave this account of what transpired. He and Mrs. Daugherty went to the tank, and he fell asleep. He was awakened upon the arrival of the appellants. Dutton grabbed him around the neck and shoulders, and Barton said, "He is another damn soldier from Hood. I will cut him like I did the guy at the house." Barton "had a hold of my testicles with his left hand, had a knife in his right hand, he made a strike at me." Mitchell was, however, able to extricate himself from the two in full possession of all his manly attributes and sustained only a cut across the chin. When he arrived back at the house Barton greeted him with this invitation, "Come on in, we will have a cutting party." After they got away from the ranch, he drove Bennett to the Lampasas hospital, where he was treated and then carried to the Army hospital at Ft. Hood.

Mills County Sheriff Stubblefield testified that he arrived at Mrs. Daugherty's ranch late in the afternoon of July 4, found the bed saturated with blood, and on the floor near the bed he found a testicle, which he carried to a doctor's office and had placed in a container with preservatives. It was shown that this

container was carried to the Department of Public Safety in Austin for analysis, and J. D. Chastain, chemist and toxicologist for the department, identified its contents as a human testicle.

In addition to the testimony of the appellants, which we have briefly discussed at the beginning of this opinion, they developed medical testimony that the loss of only one testicle would not affect a man's social standing with the opposite gender and that the excessive use of ardent spirits in the case of some individuals causes them to lose all consciousness of the nature and consequences of their acts and creates a condition of temporary insanity.

Many citizens of Brady testified to the drunken condition of appellants upon their return from the Mills County ranch.

From the jury's verdict, we are unable to determine whether they accepted the appellant's defense of insanity brought about by the immoderate use of intoxicating liquor because evidence of such is admissible only in mitigation of the penalty and the punishment here is the minimum. We do, however, find the evidence sufficient to support the conviction.

Able counsel for the appellants have filed an exhaustive brief, and we shall discuss the contentions there presented.

They first complain of the failure of the trial court to charge on circumstantial evidence. It will not be possible for us to discuss all the cases cited therein but will discuss those which we deem are most applicable here.

They assert that, as to Dutton, there was no direct evidence that he knew that Barton intended to castrate Sergeant Bennett and that, as to him, if not as to both, the court should have given the charge.

They rely on Burrell et al v. State, 18 Texas 713. We quote from the opinion: "There was no positive proof that he was aware of the intention of his companion, *or that he committed any overt act at the time, manifesting a criminal intention on his part.*" Let us determine if that rule has application here. Dutton first called Barton's attention to Bennett asleep in the bedroom; Barton stated his intention of cutting the "s.o.b.," and they proceeded into the bedroom together, where Dutton held Bennett by the shoulders while Barton performed the ig-

nobling operation. These were certainly overt acts performed by Dutton after the announcement of his companion's intentions.

In Huddleston v. State, 70 Texas Cr. Rep. 260, 156 S.W. 1168, a group were engaged in a melee and the accused was seen to strike the deceased two overhanded blows, but no one saw a weapon in his hand. The direction of the wounds in the body of the deceased was not shown. The accused denied that he participated in the attack, and because of the darkness it was a matter of conjecture as to who used the weapon which produced the wound. This court held that a charge on circumstantial evidence should have been given. We fail to see how this case could be authority here. The fact that Dutton held two men by the shoulders while Barton castrated one and attempted to castrate the other, we think, clearly authorized the trial court to submit the case to the jury as he did.

Appellant's next complaint arises out of the failure of the trial court to instruct the jury in response to his objections as to what they denominate a variance between the indictment and the proof. If we comprehend appellant's complaint, it is that the testimony of Dr. Brook, who rendered aid to Bennett at his Lampasas hospital shortly after the assault, raised an issue as to whether Bennett's testicle had actually been "cut out" as charged in the indictment. As stated originally, Mitchell carried Bennett to Dr. Brook's hospital, and after he received treatment there carried him to the Ft. Hood hospital. No evidence was introduced by the state from Bennett or anyone connected with the Ft. Hood hospital as to what transpired there. Dr. Brook was a defense witness, and his testimony will be discussed. He described Bennett's injuries as follows:

" . . . Then he had a scrotal wound which appeared to be three separate lacerations, one being exactly across the top part of the scrotum from side to side, and then along the right side of the scrotum there was a wound that ran in an up and down direction, and another that branched out from that; it took more or less the form of an inverted Y, and laying along the right side of the scrotum was a testicle which was still attached to its cord. His wounds were all properly cleaned for surgical repair, and all the wounds were repaired, and this testicle was placed back in the scrotum and covering."

On cross-examination, he stated:

"Q. And on what do you base your opinion that the other testicle was present? A. That the scrotum appeared to have a

testicle in it. I didn't make any examination, any exploration to determine if there was; I was not interested in whether he had one or two or how many . . .

"Q. Is it not possible that one testicle was gone, that there would be a swelling, a blood clot or some other swelling there present in the scrotum? A. Yes, sir."

On re-direct, he answered:

"Q. Going back to the question of the treatment of this man and what you found — Bennett there — was it or not your definite impression that he had both his testicles when you left him? A. That was the thought I had when I finished with him."

On re-cross, he testified:

"Q. But that thought is not based on any extensive examination at all? A. The only thing that I could — can absolutely swear to is that he had one.

"Q. Thank you. A. And I assumed that he had the other one. I did not make an exploration to find out."

In connection with the question raised by this testimony, the jury was instructed to acquit the appellants if they had a reasonable doubt that Bennett "did not suffer the loss of one of his testicles as a result of defendants, or either of them, cutting it out with a knife . . . . " This charge was proper and sufficient.

Appellants take the position that the above quoted testimony raises an issue as to whether a testicle was "cut out" by the appellants, as charged in the indictment, or was injured so that it later had to be removed while Bennett was at the Ft. Hood hospital or was lost by any other means than being "cut out" by the appellants at the scene of the attack (which latter state of facts, they say, would not support a conviction under the indictment as plead).

We are cited no authority in support of this position other than the general rule that an indictment which alleges the means by which an assault is committed must be supported by proof of such means as alleged.

To say that an indictment which charged that the accused deprived the injured party of his testicle "by then and there cutting it out with a knife" could be supported only by proof that the testicle immediately fell to the floor during the course

of the attack would constitute a stricter interpretation of the indictment than we are prepared to make. We would, rather, be inclined to hold that such an indictment might be supported by proof of the loss of a testicle resulting immediately or as a consequence of a cutting.

Let us summarize the entire case.

Bennett testified that he sustained the loss of his right testicle. He states that he lost only one.

Dr. Brook testified that the right testicle was not severed, that he replaced it in the scrotum, and that the left testicle may or may not have been lost.

It is uncontradicted that a human testicle was found near the scene of the attack. We say "uncontradicted" because no effort was made to impeach the testimony of Sheriff Stubblefield or Toxicologist Chastain.

We have concluded that the jury was authorized to resolve this conflict in the testimony under the charge as submitted to them and that the evidence will support their finding that Bennett lost one of his testicles.

The next complaint relates to the failure to charge on specific intent. The court in his charge defined "wilfully and maliciously" and required the jury to find in order to convict that appellants did wilfully and maliciously deprive Bennett of one of his testicles.

Since the evidence showed and the jury was required to find that the act was done wilfully and maliciously, it was not necessary that the court submit to the jury a charge on the specific intent to deprive Bennett of a testicle.

Nor was it necessary that the court instruct the jury to acquit unless they found, or had a reasonable doubt, that appellants acted wilfully and maliciously. This was not a defensive theory but an essential element of the state's case and was properly submitted as such.

We think that the fact that Dutton held Mitchell (the second man attacked) while Barton took Mitchell's testicles in his hand and cut at him removes any question as to intent or whether the attacks were wilful and actuated by malice.

What we have said, we think, disposes of appellant's contention that the jury should have been charged as to the law of aggravated assault. Recently, in Butler v. State, 160 Texas Cr. Rep. 492, 272 S.W. 2d 125, we held that a charge on aggravated assault need not be given in a robbery case unless there was some doubt that a robbery had been committed. The testicle on the floor seems to have removed any doubt that a castration had occurred.

Appellants strenuously object to the testimony concerning the assault upon Mitchell at the lake and the subsequent assaults upon the two women at the house.

If we were to concede, which we do not, that the attack upon Mitchell was an extraneous offense, still it would be admissible on the vital question of intent, wilfulness and maliciousness. Could anyone doubt their intent to castrate Bennet when they went immediately afterwards to the lake and attempted to castrate Mitchell? We think not. Their actions at the house in assaulting the women clearly demonstrate that the visit to the ranch was actuated by Barton's jealously and thus tended to show motive.

Appellants next complain of the cross-examination of Sheriff Love Kimbrough, who had testified as to their good reputation, wherein he was asked about what he had heard concerning the particular offense involved and whether he had heard about Barton having driven an automobile on a public street while intoxicated on the same day. In view of the action of the trial court in withdrawing such cross-examination and the fact that no new facts were revealed to the jury, the error, if any, was not such as to call for reversal.

Mrs. Daugherty was permitted to testify, over appellants' objection, that in her opinion Barton was sane on the day of the assaults. The fact that this answer may be contrary to what she had testified at other times could not affect the admissibility of the answer but would only have a bearing on the weight which the jury might give it. Clearly, through the more than a year of her relationship with Barton, drinking and sober, she had had a sufficient opportunity to observe him and form an opinion as to the state of his sanity on the day in question. Recently, in Autry v. State, 159 Texas Cr. Rep. 419, 264 S.W. 2d 735, we reversed a conviction, among other reasons, because an old friend who arrived upon the scene of the homicide was not permitted to give his opinion as to the sanity of the accused on that occasion.

Bill of Exception No. 2 relates to argument of the prosecutor in which he told the jury that certain of appellants' witnesses had admitted that they were running a house of prostitution. The objection was sustained, and the court instructed the jury not to consider the argument. We now determine whether reversible error is reflected by the argument, even though withdrawn. The witnesses were the manager of the hotel where Barton resided and the manager's wife.

Barton had testified that within the year and a half that he had known Mrs. Daugherty he had given her money and paid bills for her benefit to the tune of $1,200. The manager and his wife testified that she often stayed in his room at the hotel with him with their knowledge and consent. The manager's wife, explaining her attitude toward such conduct, said, "Sir, in the hotel business, you can't play God to people . . . You can't correct those things." Though slightly far-fetched, we do not consider that the argument calls for a reversal.

Bill of Exception No. 3 is qualified by the court, with the observation that the argument therein complained of appeared to be invited by and in response to argument of appellants' counsel. We are inclined to agree with the court's qualification.

Bill of Exception No. 4 shows upon its face that the argument therein complained of was not objected to at the time it was made but was assigned as error in the motion for new trial. Such a bill presents nothing for review.

Bill of Exception No. 5 relates to argument to the effect that Barton knew who was at the ranch and was planning to perform the act which he did perform as they drove out to the ranch.

In a measure, this argument was in response to argument of appellants' attorney in which he had argued that "Barton never had the slightest thought in his mind that somebody else was out there breaking up his playhouse." We think that the fact that Barton had testified that Mrs. Daugherty had promised to come to Brady on July 4 but did not come and Mrs. Daugherty's testimony that a few days prior thereto Barton had seen a note at her house which had been left there by Sergeant Mitchell in her absence and that he had read the same would authorize the conclusion that Barton realized that the reason Mrs. Daugherty had not come to Brady was because she had company.

Bill of Exception No. 6 shows that no objection was made to the argument.

Out of deference to appellants' able counsel, for whom we have great respect, we have attempted to discuss each contention advanced in their 81-page brief which impressed us as raising a serious question.

The judgment of the trial court is affirmed.