[No. 1921.]

### W. D. Ward *v.* The State.

1. Jury Law — Disqualifying Opinions — Challenge for Cause.— See the opinion *in extenso* for circumstances under which the trial court should have held certain jurors incompetent to serve on the panel, under challenge for cause, inasmuch as each had formed a disqualifying opinion as to the guilt or innocence of the defendant.
2. Temporary Insanity — Charge of the Court.— See the opinion *in extenso* for a charge of the trial court upon the defense of temporary insanity, superinduced by the immoderate use of intoxicating liquor, *held* erroneous because calculated to mislead the jury to the prejudice of the accused; and note, also, a special charge upon the subject which, presenting correctly the law of the question, was erroneously refused.

Appeal from the District Court of Medina. Tried below before the Hon. T. M. Paschal.

The indictment in this case charged the appellant with the murder of Robert Fly, in Medina county, Texas, on the 11th day of September, 1883. His trial resulted in his conviction of murder of the first degree, his punishment being assessed at confinement in the penitentiary for life.

—— Wilkey was the first witness for the State. He testified that he lived between three and four miles from Hondo City, in Medina county, Texas. He was in the town of Hondo City on the day of the homicide, and witnessed the killing of the deceased by the defendant. Defendant and deceased were in the witness's saloon,

playing with each other, most of the day. During their scuffle the deceased got the defendant by the hand, and remarked that he could hold the defendant in that manner just as long as he wanted to. He released the defendant almost as soon as he made the remark, and then turned to the bar, throwing his back towards the defendant. Just as he turned again defendant fired, and the ball from his pistol entered the deceased's head just below the right eye, and killed him instantly. The witness's saloon, in which the tragedy occurred, was situated on the south side of the railroad. The main room was in size forty feet by twenty or twenty-two feet. There was a shed room on each side. There was a double door in the center of the main room, and a window on each side. The bar was on the west or right hand side of the main room, going in. A partition crossed the floor of the main room about eight feet from the front door, and the counter reached from the front of the house to the partition. One of the windows in the main room was behind the bar. Witness was standing behind the bar at the time of the homicide. When the scuffle or play began defendant and deceased were standing at the south end of the counter, the defendant in the corner at the junction of the wall and counter. When he turned the defendant loose the deceased took a step or two towards the counter, stopped, turned towards defendant, and received the shot at that instant fired by the defendant. The witness could not recall the precise words said by either of the parties just before the shooting. The deceased remarked in substance, and in a pleasant manner: "I could have held as long as I wanted." Defendant made some remark, but witness could not remember it, even in substance. Deceased was shot as soon as he turned from the bar and faced the defendant. His head fell forward toward defendant and the partition, and his feet toward the door. Defendant stepped over the body with some such remark as: "I have fixed him." Foster caught the defendant as he stepped out of the door. Everything said by the deceased in the witness's hearing during the day was pleasant. Witness saw deceased and defendant together before he saw them in his saloon. They (defendant and deceased) were together for two or three hours during the morning, and were, to all appearances, very friendly. Deceased did nothing that the witness saw suggestive of other than friendly relations with the defendant. Dubach was with the deceased and the defendant when the scuffle began. Deceased was in a perfectly good humor when he turned from the counter and received his death wound.

Cross-examined, the witness stated that he was the proprietor of the saloon in which the homicide occurred. He was at his saloon when the west-bound train arrived on the evening before, at about 9 o'clock. He saw the defendant a few minutes after the train arrived on that night, but he did not notice his condition. He had never before seen the defendant, and would not, therefore, have been likely to notice him specially unless there was something peculiar about him. Defendant came into witness's saloon on that night (the night before the homicide) and got a glass of beer. Bill Foster came into the saloon very shortly afterwards. He (defendant) went in the back room, laid down on a bed and stayed all night. He was there at 7 o'clock on the next morning, and got a cock-tail at the bar. He took as many as one or two drinks next morning, but witness could not remember how many. Witness did not see the defendant take either supper on the night before or breakfast on the next morning. He did not know how long after the train came in it was before defendant went into the saloon, and then into the back room. He did not know in what condition defendant went to bed, but his actions and appearance led witness to believe that he had been drinking. Deceased and defendant met between 9 and 10 o'clock on the morning of the homicide, and were together, upon apparently the friendliest terms, until about noon. If an angry word or harsh expression passed between them, witness did not hear it. Deceased was a very amiable and companionable young man. Neither defendant nor deceased alluded to any previous quarrel or disagreement, in the hearing of the witness. Witness was standing at the window behind the bar when the fatal shot was fired. He saw no one about the defendant and the deceased at the end of the counter when the shooting occurred. No angry expression was used by the deceased as he and defendant came into the saloon. On the contrary, the two men were joking each other. They had not yet taken any of the drinks ordered by them just before the shooting. Defendant armed himself about 7 o'clock on that morning.

Re-examined, the witness said that defendant went into the back room between 9 and 10 o'clock on the night before the shooting, and got up about 7 o'clock on the fatal morning. Witness did not see him during the night after he went into the back room. Witness did not remember where he, himself, stayed that night. The deceased and defendant stood about four feet apart at the time of the shooting.

J. W. Carroll testified, for the State, that he lived at Hondo City during the fall of 1883. The witness was present in Wilkey's saloon

and saw the killing of the deceased. It occurred about noon on the 11th day of September, 1883. Witness went from his house to call deceased to dinner. When he stepped into the saloon he found the deceased and defendant scuffling in play. They had hold of each other's arms, scuffling. Defendant told the deceased to release him, which the deceased did. Deceased then stepped towards the bar, for the purpose, the witness thought, of taking a drink. Defendant drew his pistol, laid it across his left hand, cocked it with his right, said: "Now, G—d d—n you, I have got you," and, as deceased turned towards him, fired, striking deceased in the face and killing him dead. The deceased and the defendant were in the southwest corner of the room, which corner was formed by the junction of the bar counter and the partition. The witness was on the outside of the house, leaning on the window-sill at the northeast corner, and was looking at the parties when the fatal shot was fired. Witness saw deceased and defendant distinctly, but did not see Mr. Wilkey, nor could he see him if he was near the window behind the bar, as the door intervening, which stood open, obstructed the view behind those two points. After he fired the shot, the defendant dropped his pistol to his side, stepped over the prostrate body of the deceased, and said: "I have killed the d—d son-of-a-b—h." Witness walked off. Foster sprang out of the restaurant, caught defendant and said: "Great God, Ward! What have you been shooting around here for?" Witness took defendant's pistol. Witness thought at the time of the killing, or just before it, that deceased and defendant were friendly, and he still thought so. Deceased made no manner of attempt to assault the defendant. Witness took charge of the defendant, and an inquest was held upon the body that evening. Witness's house was on the north side of the railroad. That point of the saloon at which the witness stood was the front, and it looked towards witness's house. He saw deceased and defendant plainly from where he stood, the deceased being a very little nearer his point of view. The defendant was nearest the corner formed by the partition and the bar counter. Witness noticed the pistol on defendant's person during the day. Witness did not know whether or not Foster was armed. Deceased spent the night before at witness's house, but witness could not say at what time he went to bed, except that he retired after supper was served. Wilkey, if behind the counter, was nearer the parties at the time of the shooting than the witness was. The State rested.

William Braden was the first witness for the defense. He testified that he had known the defendant a great many years. Wit-

ness lived at Del Rio in September, 1883. He saw the defendant in Del Rio on or about the 4th or 5th day of September, 1883. He was then traveling in the interest of the San Antonio Express, a newspaper. Witness did not know from what point he came to Del Rio. During that day and night in Del Rio, the witness saw the defendant frequently, and was impressed with the belief that he was drinking. His eyes were much swollen, his face was very red, and his appearance generally indicated that he had been drinking for some time. The witness did not remember at what time the west-bound passenger train passed through Del Rio, but it was in the forenoon. Witness took several drinks with the defendant during that day, and played cards with him, Henry Bennett and Louis Keiffer. Defendant quit the game at night and went to drinking. He was quite full of liquor when the witness left him on that night. He called up everybody in the saloon and everybody who came in, to take drinks. Witness left him that night at Louis Keiffer's saloon, and could not say whether or not the defendant went to bed at all that night. Witness did not see him soliciting subscribers for the Express during the time he was in Del Rio. Witness met the defendant at breakfast at the Gorman house, and ate with him at the same table. Witness had no recollection of seeing him at dinner. He saw defendant again in front of Henry Ware's saloon, as he was going to supper. The game played at cards by witness and defendant was poker, and drinks were the stakes played for. "Whisky was the drink adhered to by defendant on that day. Witness saw him at breakfast, and did not see him there again, but witness staid there only long enough to get his meals. Witness could not now say who won or lost the games at cards, or who paid for the drinks. His recollection was that the game resulted in about a tie, and that he and defendant paid their equal proportions.

William Roberts was the next witness for the defense. He testified that he resided in the city of San Antonio, Texas. In September, 1883, the witness was conductor of one of the trains on the Sunset Railroad, his division extending from San Antonio to Sanderson, three hundred and eighteen miles. The witness saw the defendant in September, about two days before the killing of the deceased. Defendant was then on the train at Sanderson. He then had the appearance of having been on a protracted spree. Witness left Sanderson about 10 o'clock, P. M., and reached La Coste about 4 or 5 o'clock on the next morning, where the defendant left the train. Defendant did not travel that night in the

sleeper. Witness's impression was that he woke the defendant up during that night, but he was not certain. Witness returned from San Antonio with his train on the same day, and saw defendant again that night. His appearance indicated heavy dissipation. He looked wild about the eyes. He told the witness that he intended to go to Castroville, get a horse, and ride to Hondo City. Witness took him to Hondo City on that night. He was very noisy on the train. Witness could not remember that the defendant ate anything either at Del Rio or Sanderson.

Cross-examined, the witness said that the defendant got on the train at Sanderson, and traveled with witness to Hondo City. He told witness that he was going to Castroville. Witness had known the defendant about a year. The train passed Langtry about 6 o'clock, P. M., and Del Rio about 11 o'clock, P. M. Witness did not see the defendant get off at either point, which were eating points, to get meals. If he had done so, witness thought he would have seen him. Witness had seen a great deal of drinking men during his life, and was familiar with the usual effects of intoxicating liquors.

Paul Flato testified, for the defense, that he saw the defendant at La Coste on the night before the homicide. Defendant was then very drunk and very nervous. His actions were exceedingly strange. He talked to himself a great deal. He had a trunk in the care of the witness. Witness jokingly told him that he was going to charge him storage on it. Defendant protested, and asked if he could satisfy witness by "setting up" the cigars. Witness told him yes. He then started to his trunk, when witness put his foot upon it. Defendant thereupon drew his pistol and struck witness's foot with it. Witness asked: "What are you doing, Ward?" He replied: "I won't hurt you."

James Johnson testified, for the defense, that he was a porter on the train which ran from San Antonio to Sanderson. Witness saw the defendant on the morning that he went from Sanderson to La Coste. He noticed four or five persons sitting facing each other in the immigrant car. Defendant took off his hat and beat one of the parties with it, and the party called out: "Quit, Ward!" It was by that means that witness learned the defendant's name. Defendant got up from his seat when the party spoke to him, pulled his pistol and waved it for some time. Witness started to the door of the car, and Mr. Butcher said to him: "Where are you going? Don't you see that man with his pistol? You will get shot if you don't look out!"

Mr. Reinhardt testified, for the defense, that he met the defendant at D'hanis on the morning of the day he got off the train at Hondo City. He was very drunk and reckless, and was handling his pistol all day. Witness, defendant and Foster were in a constant scuffle with their hats. Witness did not think Ward crazy, but thought him very drunk. Witness saw no one else handling a pistol.

George W. Brown, deputy sheriff of Medina county, testified, for the defense, that he saw the defendant on the evening of the day before the killing. When the witness, who was in charge of the jail, was on his way to supper, he saw Gillis and defendant together, and thought they were playing with each other. Gillis complained that defendant had a pistol, and urged witness to arrest him. Witness replied that, if the defendant had a pistol, he supposed he had a right to carry it. After supper, witness saw defendant in front of Wernette's saloon, and thought that Gillis had some reason in advising his arrest. His appearance indicated that he was not yet improving from a protracted debauch. His face was much bloated and his eyes very red. Witness called the defendant to the jail, opened the hall door, and invited him in to listen to the banjo music. Defendant replied that he wanted to go to Hondo City. Witness saw defendant often in Castroville, and it was his opinion that the defendant was crazy drunk. He was irrational, unaccountable, and had not the least conception of what he was doing. He appeared not to have slept for several days and nights. Witness saw the defendant after his arrest, and knew, from his action and deportment, that he did not in the least realize his situation. His condition then confirmed witness in the opinion that he was crazy drunk when he left Castroville. The witness was an officer, and had he known, at the time Gillis spoke of defendant's pistol, that he was in a drunken condition, witness would have filed a complaint against him. Witness's only object in calling Ward to the jail was to get him to listen to the music being played there, in the hope that defendant would become interested and stay. Defendant's eyes were then blood-shot, his face was bloated, he seemed to be very nervous, and to be suffering from loss of sleep. Defendant's condition at the time of his arrest was not such as is common to ordinary men after the commission of a homicide. Witness, however, could not say that the homicide in this case did not influence that condition in the defendant. Defendant had been on a long, protracted spree. His condition could not have been brought about by a one day's drunk. Witness thought from defendant's appearance that he must have been drinking for a week or two.

James A. Slaton testified, for the defense, that defendant was in his office on the day before the homicide. He undressed twice and tried to sleep but failed. After each effort he got up, staggered around, drew his pistol and threw it down on witness. When he did this the second time, witness got pistols himself, and told defendant that he would shoot him if he threw his pistol down on him again. Defendant replied that he would not hurt the witness. Witness tried to get defendant to go off with him, but defendant seemed to understand witness's purpose to get his pistol, declined to go, put his hand on his pistol and said: "I intend to keep this." Defendant had been on a hard, protracted spree, and was utterly incapable of discerning right from wrong.

Ex-surveyor Gillis testified, for the defense, that he met defendant in Castroville on the day before the homicide. Defendant had evidently been drinking very hard, and was rude and aggressive to his friends. Witness and defendant took several drinks together, some at Wernette's saloon. Defendant had a pistol, and witness told him politely that he was in no condition to have it. Defendant took offense at that advice. Witness found Deputy Sheriff Brown near the court-house, and threw up the defendant's coat to show Brown that he had a pistol. At this defendant again became offended, and became offended with the witness again because witness refused to get money for him. He was not so drunk from whisky in the morning as in the evening, but was mentally drunk. Defendant was in no condition of mind to discern right from wrong, to be responsible for or to know what he did. He was not in his right mind.

F. X. Schmidt testified, for the defense, that he took a drink with defendant in September, 1883, just before the homicide, and became convinced immediately afterwards that defendant was crazy drunk.

Jacob Franzer testified, for the defense, that he took defendant to La Coste on September 10, 1883. Defendant on the way pulled his pistol twice. When witness asked him for his fare, defendant drew his pistol and told witness to get out of the hack,— which the witness promptly did. Defendant looked wild and crazy.

E. B. Vance testified, for the defense, that he saw defendant in Castroville on the evening before the killing, and, from his knowledge of him, knew that he was debilitated from a long and violent spree. He was, in the opinion of the witness, crazy drunk and had been so for some days, and was utterly incapable of discerning right from wrong. Witness saw a difficulty between defendant and Wernette. Defendant said something which Wernette misunderstood. Wernette cursed defendant and defendant drew his pistol.

Wernette went off, and defendant went into the saloon. Wernette's brother complained to defendant of his conduct, and defendant replied: " I said nothing out of the way, but I am not afraid of the whole Wernette family."

Josie Wernette testified, for the defense, in substance, that he saw the defendant frequently on the day before the homicide, and, judging from his conduct and appearance, thought he was then, and had been for several days, crazy drunk. Witness was one of a number of people defendant covered with his pistol and tried to shoot.

Captain Siceluff, business manager of The San Antonio Express newspaper, testified that defendant had been for some time prior to September 11, 1885, in the employ of the paper as traveling agent and correspondent. He had given satisfaction up to September 3, 1883, which was the last time the witness heard from him until the killing of Fly on September 11, 1883.·

Captain Sam Lytle and Doctor Rice, testifying for the defense, stated that, in their opinion, the defendant was crazy drunk on the day before the killing of Fly.

Father Japes testified, for the defense, that he saw the defendant a night or two before the homicide, and thought that he was then getting over rather than beginning a hard spree. He talked rationally about the matter in hand, but was nervous, worn-looking, and had the appearance of want of sleep. He looked like he had been drinking very hard, and was beginning to sober. The defense closed.

Sheriff Foster testified that he met defendant in Castroville on the day before the homicide, and was with him for a while in the morning. He saw him again that night, and went with him in a hack to La Coste. He told witness about a row he had with Joe Wernette, and said he would have another with him at La Coste. He went to bed within thirty minutes after he reached Hondo City, in Wilkey's back room. Witness waked him up at 7 o'clock on the next morning. He appeared to be all right, passed into the saloon, called for and drank a cocktail. Witness saw him in Hondo City off and on all that morning. When the defendant and the deceased met next morning, they met like old friends, and were together at and about the saloon, and were drinking together until about half-past 12 o'clock. Witness got up from his seat in the barroom at about half-past 12, and as he passed out Fly caught him by the shoulder and invited him to take a drink. Witness passed into the next room to dinner, and while eating, he heard the fatal shot fired. As witness, on his way back to the saloon, whither he started immediately, passed the window between the saloon and restaurant,

he saw the defendant and heard him say that he had killed the
" d—d son-of-a-b—h." Witness and defendant met at the saloon
door; witness caught defendant by both arms and held him until
Carroll stepped up and took his pistol from his scabbard. Defend-
ant appeared greatly excited after his arrest. He seemed much sur-
prised when witness caught him, and he struggled somewhat to get
loose. Witness held defendant in Hondo City until about 4 o'clock
on the next morning, when he took him to Castroville and put him
in jail. Witness saw defendant's authority to carry a pistol on
the day before the homicide. Defendant appeared sensible on the
morning before and on the morning of the killing, but was drink-
ing on the latter morning.

George Carle of Hondo City testified that he had known the de-
fendant some three or four years. He cashed a draft for the
defendant on the day of but before the homicide. Defendant was
sane, but appeared to have been drinking. The business was trans-
acted in five minutes, defendant indorsing the draft.

The substance of the testimony of the remaining witnesses for the
State in rebuttal was, that though the defendant was drinking on
the day of the homicide, he was nevertheless sane. They based
their opinions upon his conduct and conversation.

Doctors Jones and Rice, testifying as experts, for the defense,
stated that they had heard all of the evidence in this case, and
thought it disclosed, unquestionably, that the defendant was insane
at the time of the homicide, and utterly incapable of discerning
right from wrong.

The motion for new trial raised the questions discussed in the
opinion. The facts relating to the challenged jurors appear fully
in the opinion.

*J. A. & N. O. Green* and *J. A. Green, Jr.*, for the appellant. It
will be seen by reference to the first proposition under the first
assignment of error that the court forced the defendant to challenge
the juror J. R. Scates, and it will be seen also, by reference to bill
of exceptions No. 2, that the defendant exhausted his peremptory
challenges, and that the objectionable juror Hitzfelder was forced
upon the defendant after his challenges were exhausted. It is
almost impossible from the language of Scates for him to have gone
upon the jury and rendered a legal verdict. He had talked to the
witnesses about the case. He had strong opinions as to the guilt or
innocence of the defendant — had expressed those opinions. It
would take good, positive and conclusive evidence of truthful men

to change his opinions. Yet the court held this juror qualified because he stated that his opinion would not influence his verdict. The juror Sanders in the Rothschild case, 7 Texas Ct. App., 541, said that he would not take his opinion (a much slighter one than Scates's) into the jury box if selected as a juror, but would throw it aside and go by the evidence, as he could lay aside his opinions at will. The court, through Clark, J., says of this juror: "The fact that a juror may say that notwithstanding his opinion formed from hearsay (not from conversation with witnesses) he can try the case impartially, manifests in most instances a recklessness of judgment and a state of mind less prepared to receive and allow a fair defense than if he had believed on proof which furnishes at least *prima facie* evidence of guilt." It was clearly apparent to the court, as appears from bill of exceptions No. 2, that there was still a large number of competent jurors in the county for the trial of the cause, and the Rothschild case says, quoting *Black* v. *The State*, 42 Texas, 382: "And it was further held that if, upon an examination of the juror, it was doubtful whether he was impartial or not, it would be safer, and more in unison with the spirit of our Constitution and laws relating to the trial by jury, to decide against the qualification of the jurors." If the defendant had not been compelled to challenge this juror he would have been able to challenge the juror Hitzfelder.

The same reflections apply to the juror Newton, treated of under the fourth assignment of error. This juror had formed an opinion as to the guilt of defendant from hearsay,— so had the juror Sanders in the Rothschild case. It would take evidence to remove that opinion. He could discard that opinion (so could Sanders), try the case on the evidence, but the opinion he had *might have a bearing on him.* If this juror was not of doubtful impartiality we know of none. After he had exhausted his peremptory challenges the juror Hitzfelder was forced upon defendant.

Another phase of the jury question is presented in the cases of the jurors Bailey and Ship, both of whom tried the case. The first one said: "He had formed some opinion then of the guilt or innocence of defendant. It would take evidence to change that opinion. He got that opinion from hearsay or general gossip. He heard about it through talk and newspapers. What he read purported to be the truth as well as he remembered. It was a settled opinion while he was being interrogated. If the evidence turned out as he had read it he would be of the same opinion still. He (thought) that opinion would not influence his verdict."

Ship said " he had formed and expressed an opinion as to the
guilt or innocence of the defendant. He could *not* discard it in go-
ing into the jury box. It would take evidence to change it. He
would render a verdict upon the evidence, uninfluenced by that
opinion; the parties who told him were not witnesses, but told him
what purported to be the circumstances and facts of the case, and
(he) may have had other conversations since that with same parties."
It became perilous for the defendant to object by peremptory chal-
lenge to jurors which had such *slightly strong* opinions as these, and
he refused to challenge peremptorily after his challenge for cause
was overruled. No man who had made such answers as these two wit-
nesses and who had a proper appreciation of the old maxim, " Con-
vince a man against his will, he's of the same opinion still," could
possibly say that he could try the cause uninfluenced by the impres-
sions that had so engraved themselves upon his mind. These men
had not formed vague ideas of the facts of defendant's slaying de-
ceased. The one (thought) that the opinion would not influence his
verdict, and the other could not discard it in going in the jury box.
Each had such a settled and definite opinion that it would take evi-
dence to remove it. These men sat upon the jury and the verdict
of life-time confinement in the penitentiary shows what hold their
opinions had upon them, either to lead others into the same opinion
upon the jury or to be readily moulded into a verdict adverse to the
defendant by a stronger mind, and that too after a jury at a pre-
vious term had been unable to say that the defendant was guilty of
any crime. We are aware that the case of *Post* v. *The State,* 10
Texas Ct. App., 591, may be referred to by the State. In that case
the jurors in question stated that they had formed an opinion and
that evidence would be required to remove the same. They " had
never heard witnesses, nor any one who pretended to know the
facts, detail them; that the opinion was not definite and fixed —
have no present conviction; could render verdict entirely free from
any previous opinion," but the cases are not parallel.

Bailey had formed an opinion that it would take evidence to re-
move. It is true he got it from the newspapers, but what he read
*purported to be the truth,* and from that reading he had a *settled
opinion.* If the evidence was the same as he had read, he would
hold to his opinion. He did not know whether his opinion would
influence his verdict or not. It is reasonable to believe, or in other
words, it is to be presumed that the newspapers of the county, where
there were so many facilities for getting the particulars of the case,
would publish the truth. Bailey read it and he ought to have been
excused on defendant's challenge for cause.

Ship could *not* discard the opinion that he had formed from what purported to be the circumstances and facts of the case as they were told to him by different persons.   The Post case says: "If the juror has talked with the witnesses, or read what purported to be a correct account of the transaction, the opinion would likely be more settled and *established*.   If, however, it is formed from reports and rumors, the probability that it is fixed or established is very much lessened. While it is true that an opinion from rumor may be so well established as to render the jurors incompetent (*Shaw* v. *The State*, 27 Texas, 750; *Grissom* v. *The State*, 4 Texas Ct. App., 386; *Rothschild* v. *The State, supra*), yet the source of information becomes of vital importance when considering the extent of the convictions of the juror.   As before observed, the most feeble opinion requires evidence of some character to be removed.   The fact to be ascertained is whether or not the juror has formed such an opinion as will probably influence his verdict.   These jurors swore that they had formed no such opinion."   It is different with Bailey and Ship.   The one had a settled opinion gotten from what he read; the other could not discard his opinion from what he had heard.   The court had two opportunities to excuse these jurors, viz.: on the challenge for cause, and after defendant's challenges were exhausted he asked the court to excuse the said Bailey and Ship from the jury, and allow him a choice from the jurors yet remaining summoned upon the special *venire*.   Chief Justice Roberts says in *Horbach* v. *The State*, 43 Texas, 260: "We know of no law or established practice under the law which sanctions the peremptory challenge of a juror by either party when thus (after the juror has been) placed on the jury, whether it is full or not.   There may be discretion in the court for excusing or standing aside a juror after he is thus selected for some good cause shown at the time why the juror cannot or ought not to serve on that jury."   Judge White says in the case of *Dreyer* v. *The State*, 11 Texas Ct. App., 641: "In this country, where fair and impartial jurors can be had so readily, there is really no reason why questions of this character should arise, and in all cases where there is a possibility for serious doubt as to the impartiality of a juror, *from whatever cause*, the court, in the exercise of the discretion conferred, upon it, should promptly discharge him."   It must be remembered that notwithstanding defendant exhausted all his peremptory challenges, the objectionable jurors, Bailey, Ship and Hitzfelder, sat on the jury.

We come now to the discussion of the case of the juror Hitzfelder.

The counsel for the defendant asked the juror as their first ques-

tion: "Can you read and write the English language?" The une-
quivocal answer came in response: "I can't read and write the
English language." It would seem that there was no necessity,
occasion or opportunity to inquire further with reference to the
matter, but the court upon close interrogation elicited the following:
"Read and understand newspapers, write receipts, orders and bills
of sale. Could read some, not all of judge's charge if printed, and
could understand some of it. Don't know if I can read judge's
handwriting, never saw it." Further questioned by defendant's
counsel, he says, showing his own distrust of his ability to read and
write and thereby become a qualified juror: "I can't read plainly.
I have never read Judge Paschal's handwriting. *I could not read
and understand the law as presented by the judge in his charge if it
was printed.* I can read a receipt and I can write a receipt. *I
could not understand* all of a column in a newspaper." And it
further appearing to the court that the requisite number of jurors
who are able to read and write the English language could be found
outside of the said Hitzfelder, in the county of Medina, for the trial
of the cause, the defendant challenged the said Hitzfelder for cause.
The court refused to sustain the challenge to the juror for cause,
because the juror had answered that he both read and wrote the
English language. This question has been before the honorable judge
who tried this cause at least twice before. The first time in the
case of *Nolen* v. *The State,* 9 Texas Ct. App., 420. The juror could
neither read nor write the English language, but spoke it, and read
and wrote the German language. The court says in the opinion:
"We confess that the inclination of our minds is to hold that when
the Legislature enacted the law that inability to read and write is a
disqualification of a juror, they had in their minds the language they
themselves made use of, and the common language of Texas and
the other American States — the English language. But, inasmuch
as the question is important, and because its solution is not indis-
pensable to a decision of the present case, we decline to do more at
present than to call attention generally to the subject, in order that
it may be thoroughly investigated, and, if need be, that a legislative
expression may be elicited. We simply indicate our present impres-
sions as the result of the investigations we have had opportunity to
make."

In the case of *Wright* v. *The State,* 12 Texas Ct. App., 167, the
court say further: "In Nolen's case, however, it not being neces-
sary to a determination of the case to decide the question, the court,
in view of the importance of the question, contented itself with

calling public attention to the subject with the view of invoking legislation on the subject. This has not been had, nor are we aware that the attention of the Legislature has ever been invited to it. Our opinion then was, and still is, that the words 'read and write' employed in the statute must be held to mean an ability to read and write the English language, and the qualification of being able to read and write the German language would not remove the objection or qualify the juror."

The question to be decided in reference to the juror Hitzfelder is this: Did he read, write and understand the English language sufficiently? He answered unqualifiedly at first: "*I can't read and write the English language.*" And in further examination said: "*I could not read and understand the law as presented by the judge in his charge (even) if it was printed.*" It is true he could read and write a receipt, and could read and understand something that was contained in a newspaper. The court refused to allow the defendant to show the juror's inability to read and write. We think that the juror was not qualified. In Lyle's case, 41 Texas, 172, the learned judge says: "The Constitution declares that 'the right of trial by jury shall remain inviolate.' It cannot be considered as remaining inviolate when the jurors can neither speak nor understand the language in which the proceedings are had. If the trial by jury is to remain a substantial fact and an important right, and is not to be substituted by a legal fiction bearing the name, but wanting in the most important qualification of a jury, namely, *the capacity to understand what the pleadings contain,* what is said by the counsel in their address to the jury, *and utterly unable to comprehend the charge of the court,* then it is necessary that jurors unable to speak or *understand* the English language should be excluded from the panel." In the case of *Etheridge* v. *The State,* 8 Texas Ct. App., 134, we find the following: "Ignorance of or inability to speak and *understand* the English language, though not mentioned, has always been held a disqualification by virtue of the constitutional guaranties of a fair and impartial trial, and one conducted by due course of the law of the land." In the case of *McCampbell* v. *The State,* 9 Texas Ct. App., 125, we find the following language: "The right of a defendant charged with felony to be tried by jurors who *understand* the English language is not an open question in this State." In Lyle's case, 41 Texas, 172, the question was maturely considered, and determined affirmatively, and no subsequent legislation, organic or statutory, has qualified the ruling in that case.

Our Code of Criminal Procedure, embodying the jury law of

1876, provides that an inability to read and write is a cause for challenge, except when it appears that the requisite number of jurors who are able to read and write cannot be found in the county. But this cannot affect the constitutional qualification as determined in Lyle's case, nor force a citizen to trial in any locality, before a jury, or *any portion of a jury, who are unable to understand the language in which the proceedings are required by law to be conducted.* A trial would be equally fair and impartial, within the meaning of the Constitution, before a jury of deaf mutes, who, by reason of their misfortune, could not hear a word of the testimony or argument of counsel; and a trial before either would be nothing less than a mockery." In the case of *Wright* v. *The State*, 12 Texas Ct. App., 168, the court says: "In our opinion the defendant was deprived of a fair and impartial trial when there was forced upon him one juror who could not read and write the English language, *and could not read the charge of the court for himself.*" In addition to the refusal to discharge the juror for cause as he had answered, the defendant wished to offer evidence in support of his challenge, by causing the juror to take a pen and write and to read from a book. The court would not allow it. It was, as we understand it, not necessary for the defendant to show in his bill of exceptions how much evidence and what sources of evidence he had to show the incompetency of the juror, when the court closed out all attempts to disqualify the juror in accordance with the statute by the remark, " the juror has said he can both read and write the English language." The fourteenth cause for challenge is: " That he cannot read and write. This cause of challenge shall not be sustained where it appears to the court that the requisite number of jurors who are able to read and write cannot be found in the county." In this case it affirmatively appeared that there was still a considerable or sufficient number of jurors, who both read and wrote the English language, to fill the jury. Article 637, Code Criminal Procedure, says: " Upon a challenge for cause the examination is not confined to the answers of the juror, but other evidence may be heard in support of or against the challenge." Even if defendant had no other evidence, what could be more convincing than the practical test which the defendant proposed to apply to the doubtful juror? The court had, however, become satisfied from what the juror had said that he both read and wrote the English language.

Reeves, J., says in the well considered case of *Shaw* v. *The State*, 27 Texas, 755: " The examination is not restricted to the juror, but other proof may be heard in testing his qualifications." In *Massey*

v. *The State*, 10 Texas Ct. App., 645, Presiding Judge White says: "Whilst it is true the court is made the judge, after the proper examination, of the qualifications of jurors, still this does not deprive a party of his right, where the juror's qualification is in doubt from his own answers, to have him further examined by the court or under its direction."

Leaving out for the present the question as to whether the juror qualified himself by his subsequent examination, we think the court should have excused the juror upon his first answer, viz.: "I can't read and write the English language." In *Shaw* v. *The State, supra*, the court says: "To ascertain whether this cause exists or not the juror must first be asked 'whether in his opinion the conclusion will influence his verdict?' If he answer in the affirmative, he *shall be discharged*. If he answer in the negative, he shall be further examined by the court, or under its direction." The opinion in the case of *Stagner* v. *The State*, 9 Texas Ct. App., 440, discusses the question and concludes: "Our opinion is that, in the character of investigation mentioned in article 636, clause 13, when it reaches the point where the juror must decide for himself whether or not the opinion he has formed will influence his verdict, and he has answered a proper question eliciting an unequivocal answer, and has answered the question in the affirmative, that the examination should cease and the juror be discharged. And if he answers in the negative, *then, and only then*, should he be further examined by the court or under its direction, as to how his conclusion was formed and the extent to which it will affect his action, in order to satisfy the court, who then becomes the judge as to the extent the opinion formed will influence his verdict; and even then the matter should be clear to the mind of the court, and if not satisfied that he is impartial, it would still be the duty of the judge to discharge the juror." It appears to us that there ought not to be different rules applicable to different grounds for challenge.

The thirteenth cause for challenge is no more a cause than the fourteenth. In the one case reason tells us indubitably if the juror answer in the affirmative he is immediately by that answer disqualified and ought to be instantly discharged without further interrogation. In the other, if he answer unequivocally "I can't read and write the English language," he ought to be discharged. No insinuating persuasion ought to be indulged in order to give the man a chance to escape from the "soft impeachment" of not being able to read and write the language of the country of which he is a citizen. In this country to allow a man who cannot read and write the Eng-

lish language would be a premium upon ignorance. It would be degrading to all intelligent citizens to permit men who persistently refused or neglected to properly qualify themselves for useful citizenship to enjoy the same privilege or to perform duties with them which required the greatest care, caution and intelligence.

The general law, as it applies to the formation of the jury in this case, and as it has been decided by the court of appeals, is well stated by Judge Clark in his digest of "The Criminal Laws of Texas," p. 502:

1st. "Driving a defendant to a peremptory challenge of an incompetent juror is not cause for reversal when he fails to exhaust his challenges." And further: "The mere fact that defendant exhausted his peremptory challenges signifies nothing, unless it be shown that thereafter an obnoxious juror was thrust upon him." Id., p. 502.

In this case the jurors Scates and Newton were incompetent.

"If the juror had formed an opinion as to the guilt or innocence of the accused and entertained that opinion when summoned and about to take his seat as juror, and it would require evidence to remove it, he was not impartial, and a challenge for cause should have been sustained." (*Meyers* v. *The State*, 7 Texas Ct. App., 651.)

Defendant's challenge for cause was overruled and he challenged peremptorily. His peremptory challenges were afterwards exhausted, and the juror Hitzfelder, whom we think was absolutely disqualified,— he was at least objectionable,— sat upon the jury.

The court says in *Loggins* v. *The State*, 12 Texas Ct. App., 83: "The court cannot regard the objection to the ruling of the court upon the competency of a juror as a valid one, unless the accused had been thereby compelled to accept an *objectionable* juror, after the exhaustion of his right of challenge." And quoting *Meyers* v. *The State*, 7 Texas Ct. App., 653, they say: "The substance of the statement is that four persons were placed upon the jury after the defendant's peremptory challenges had been exhausted, but there is no pretense that either of these four persons were in any manner *objectionable* to the defendant, nor is it made to appear that they, or either of them, would have been challenged peremptorily if his challenges had not been exhausted." The whole opinion of the court on rehearing in the Loggins case seems to be founded upon the following from 2 Cooley's Black., Book IV, p. 353:

"A peremptory challenge is grounded upon two reasons:

1st. "As every one must be sensible, etc.

2d. "Because, upon challenge for cause shown, if the reason

assigned prove insufficient to set aside the juror, perhaps the bare questioning his indifference may sometimes provoke a resentment; to prevent all ill consequences from which, a prisoner is still at liberty, if he pleases, peremptorily to set him aside."

Can it be possible not to suppose, taking everything into consideration, that Hitzfelder was at least *objectionable*, if not absolutely disqualified? Will not the court give defendant's counsel the credit of having at least sufficient common sense to have peremptorily (if he still had peremptory challenges) challenged Hitzfelder after the challenge for cause upon such a ground had been overruled, if he had had the slightest idea of obtaining an acquittal^ Nobody could have tried harder to get rid of a juror. Notwithsta. he court, in *Loggins* v. *The State*, 12 Texas Ct. App., 79, says ւ �˞ument of counsel for appellant " is specious, but in our opinion ւnd," we believe that the weight of reason is with appellant's ւsel. Peremptory challenges are given to a defendant for the pur. of getting rid of men whom he does not wish to be upon the jury, ᴝut against whom he can assign no cause. In the experience of every lawyer it will be often found that there are jurors against whom no cause in law could be found, yet they are much more objectionable than some good conscientious jurors who are sufficiently honest to show a good cause against themselves. The latter, in some instances, may be accepted, the former never.

The court further says, in the Loggins case, p. 85: " But it is said he might have wanted to use the peremptory challenges on one of the final panel. This is mere speculation, and, if permitted to be indulged in, might be urged indefinitely." It seems to us, if there is an opportunity for speculation or doubt about whether a conviction of a capital crime has been properly had, it ought to be resolved in favor of the prisoner.

It is well settled by the authorities that if an incompetent juror is selected upon the jury, and the prisoner fails to exhaust his peremptory challenges, the objection is waived. We can find no authority that makes it compulsory upon the defendant to show, 1st, that he exhausted his challenges; 2d, that the court erred in overruling good challenges for cause, and forced defendant to a peremptory challenge to rid himself of an objectionable juror; and 3d, that some objectionable juror sat upon the jury, even though defendant did exhaust his peremptory challenges, before he can have the benefit of the lower court's error upon appeal.

It is well settled that " when the prisoner challenged a juror for cause, and his objection was overruled, and the juror in fact was

incompetent, and the prisoner afterwards challenged him peremptorily,— that unless the record showed that the prisoner exhausted his peremptory challenges, the judgment ought not to be reversed," — seeming to intimate that if error had in fact been made in overruling a challenge for cause, and the defendant had in fact exhausted his peremptory challenges, that would have been sufficient for reversal. (*McGowan* v. *The State*, 9 Yerg., 184, and the other authorities cited in *Loggins* v. *The State, supra;* also Thompson & Merriam on Juries, sec. 276.) In fact a respectable number of authorities go still further and say that "no obligation rests upon a party to make use of his peremptory challenges for the purpose of excluding a juror unsuccessfully challenged for cause. He has a right to except to the decision of the court upon such challenge, which, if erroneous, must be corrected by awarding the party a new trial." (Thompson & Merriam on Juries, sec. 276; *People* v. *Bodine*, 1 Den., 281; *Freeman* v. *People*, 4 Den., 9, 31; *Brown* v. *The State*, 57 Miss., 424; *People* v. *Stewart*, 7 Cal., 140; *Sampson* v. *Schaffer*, 3 Cal., 107; 13 Ark., 720; 1 Kans., 468; 15 Kans., 400.)

Judge Willson says in *Spear* v. *The State*, 16 Texas Ct. App., 113: "Upon examination as to his qualification to serve as a juror in the cause, he stated under oath that there was an established conclusion in his mind as to the guilt or innocence of the defendant that would influence his verdict. Having thus answered, the law emphatically says 'he shall be discharged.' We are of opinion that when a juror thus answers, it is not only a ground of challenge for cause, but it absolutely disqualifies him as a juror in the case, and it is the duty of the court to stand him aside, whether challenged or not. It is true that in specifying who are disqualified to serve as jurors the Code does not include one who has thus an established conclusion in his mind, but makes such conclusion a cause for challenge. We are of opinion, however, that when the law says, as it does, that when the proposed juror answers affirmatively that there is established in his mind such a conclusion as to the guilt or innocence of the defendant as will influence him in his action in finding a verdict, *he shall be discharged;* that this is a peremptory mandate, which the trial judge would not be at liberty to disregard, but must of his own motion stand the juror aside." It is clear that these jurors had such an opinion and the court ought to have discharged them. The court in the case of *Loggins* v. *The State*, 12 Texas Ct. App., 84, says (and it exactly fits the case of Bailey and Ship): "Nor can he complain that he has been deprived of a valid challenge for cause, because as to that he has rid himself of the cause by his peremptory chal-

lenge.   Moreover, the court below has decided that his challenge for cause was not good, and *prima facie* the ruling was correct.   If not, then why did he not stand upon the validity of the challenge without resorting to a peremptory one? and then and in that event, if the juror was impaneled and his peremptory challenges afterwards exhausted, he would reasonably have had good ground for complaint, and one which could and would be heard and corrected in this court."   The court overruled a good challenge for cause to the jurors Bailey and Ship — the defendant stood upon the validity of his challenge without resorting to a peremptory one, and afterwards exhausted his peremptory challenges.

In the fourth paragraph of the charge the court charges that the facts must furnish satisfactory evidence of the existence of a sedate, deliberate mind on the part of the person killing.   If intent or malice is a necessary ingredient of crime, then the State must prove it beyond a reasonable doubt.   If the defendant introduces evidence which tends to show his insanity at the time of the act, and the jury believe the testimony thus offered, no crime has been committed. If he showed by the tendency of his evidence that he has committed no crime (not that he has absolved himself from guilt), then it devolves upon the State to show that he was sane and did have the malicious intent at the time of killing.   This must be done beyond a reasonable doubt.   (See opinion of Judge Hurt in *King* v. *The State*, 9 Texas Ct. App., 515; Same Case, 13 Texas Ct. App., 285, where the previous case is approved.)

The ninth paragraph of the charge does not charge the law correctly with reference to temporary insanity produced by the immoderate use of intoxicating liquor.   The second section of the statute says: "When temporary insanity is relied upon as a defense, and the evidence tends to show that such insanity was brought about by the immoderate use of intoxicating liquors, it shall be the duty of the district and county judges to charge the jury in accordance with section 1 of this act."   (Act 1881, p. 9.)

Instead of following the statute the court goes on to construe the meaning of the word *recent*, and, as if he were a physician, to diagnose the case of defendant.   He must not be insane only temporarily : no not that, he must have a disease — a specific, a peculiar and well-defined disease.   The court says it must not be a condition of mere drunkenness or a drunken frenzy.   If we understand it, the word frenzy means madness, mania, temporary insanity.   If it was produced by immoderate use of intoxicating liquors, a use which was not recent, then according to the statute defendant ought to be

acquitted.  The use of the words "disease" and "specific disease" is not warranted by the law.  Besides being not the law, they make the charge one upon the weight of the evidence.  Webster says that insanity " is applicable to any degree of mental derangement, from slight delirium or wandering, to distraction."  The statute says:  " Temporary insanity produced by the immoderate (non-recent) use of intoxicating liquor."  If the defendant was affected by any of the degrees of insanity, and this insanity arose from the immoderate (non-recent) use of intoxicating liquor, he ought to be excused.  But the court, going to extremes, says:  " But the condition of the mind must be that of some *disease*, the result of or engendered by the long continued or continuous (not immoderate in the sense of the statute) use of ardent spirits, such as *delirium tremens*, as contradistinguished from that form of it called drunkenness, and not a condition of mere drunkenness or drunken frenzy; for if the long continued use of ardent spirits has not produced some specific disease or condition of the mind coming under the general head of insanity, but has only produced drunkenness, then such a condition of the mind does not excuse one for the commission of a crime." ·

In describing the recency of the immoderate use in the same paragraph the judge says:  " Temporary insanity, if caused by the immoderate and continuous use of intoxicating liquors for a long time (why not say for twenty years or so) before the commission of the crime, for such a period as could not in reason be said to be recent, would be an excuse for the commission of crime."

Although the charge does not in so many words say so, the clear purport of it is:  " Gentlemen: I charge you that the defendant has been proved to you to have been drunk only about eight days — from the 3d to the 11th of September.  This was not immoderate, continuous use; it was recent use of intoxicating liquor.  He was temporarily insane, but his insanity amounted only to a disorder or derangement; it did not amount to a disease — a specific disease. You will therefore consider time as the essence of your verdict, and give him as long a sentence as the law allows."  If such charges as these are to be upheld, one man becomes judge, jury and executioner. The charges asked by the defendant are exactly within the statute. They comprise the whole law upon the subject, and are taken from established authority, in the light of which the statute itself was enacted.

The verdict and judgment are contrary to the law and the evidence.  The evidence is set out in the statement of the case.

Art. 606, Code Crim. Proc., says: "All murder committed by poison, starving, torture, or with express malice, or committed in the perpetration, or in the attempted perpetration, of arson, rape, robbery or burglary, is murder in the first degree; and all murder not of the first degree is murder of the second degree."

The court says in the case of *Ake* v. *The State*, 30 Texas, 474: "At common law, when the fact of killing is established, the presumption of law is that it is done upon malice aforethought, until the contrary appears; therefore the circumstances relied on to extenuate, excuse or justify, if they do not arise out of the evidence of the prosecution, must be introduced and proved on behalf of the accused, or it is murder.

"And so, under our statute, we think this rule should be carried no further than to raise, from the fact of killing, the presumption of murder in the second degree, if there be no explanatory circumstances introduced by the State or prisoner.

"Such presumption ought not to be held sufficient to take away life. To establish express malice, some affirmative evidence should be introduced by the State. But the evidence as to this, as well as the other ingredients of crime, may be either positive or circumstantial; whichsoever kind resorted to, however, should be of a nature to convince the understanding beyond a reasonable doubt.

"Do the external facts and circumstances of the case at bar disclose sedate mind and formed design antecedent to the killing, if but for a moment? Do we discover any concerted schemes, former menaces or grudges? *If not, malice express is wanting, and a conviction of murder in the first degree cannot be sustained.*"

In the case of *Hamby* v. *The State*, 36 Texas, 528, the court says: "When a homicide has been proven, that fact alone authorizes the presumption of malice, and, unexplained, would warrant a verdict for murder in the second degree. But express and premeditated malice can never be presumed; it is evidenced by former grudges, previous threats, lying in wait, or some concerted scheme to kill or do some bodily harm, as poisoning, torturing, or the attempted perpetration of rape, robbery or burglary; and these evidences of express malice, or some one of them, must be proven as directly as the homicide before the jury is authorized in finding a verdict for murder in the first degree."

The court says, in *Neyland* v. *The State*, 13 Texas Ct. App., 549: "Where it is shown that a homicide was intentionally committed, and the facts show that it was done neither with express malice nor circumstances excusing, justifying or mitigating the act, that the

law, in that event, implies malice, and the offense is murder in the second degree."

The gist of *Burnham* v. *The State*, 43 Texas, 322, is given in the syllabus thus: "Two men, utter strangers to each other, on their first meeting engaged in an encounter. The difficulty began by an effort on the part of the deceased to stop the way of the survivor as he was passing, followed by the drawing of a pistol by the deceased, over which a struggle occurred for its possession. During the struggle the pistol fired and deceased fell, whereupon the survivor, after stepping from the body four or five steps, instantly returned and fired a pistol at the head of his late adversary, inflicting a mortal wound. Not more than twenty seconds elapsed from the first meeting until the consummation of the homicide. *Held*, that the circumstances attending the killing did not afford evidence of that express malice necessary to constitute murder of the first degree."

In this case the sum of the facts establish, in the most charitable light, both for the State and the defendant,— that the deceased and defendant were friends; that defendant had been exceedingly drunk for about eight days prior to and up to the time of the killing; that deceased and defendant were playing around in a drinking carouse all the morning; that as a result of, and in a continuation of, this playful state of affairs, the defendant suddenly kills the deceased without previous provocation. This cannot be murder in the first degree.

*A. C. Brietz*, also for the appellant, filed an able brief and argument.

*J. H. Burts*, Assistant Attorney-General, for the State.

HURT, JUDGE. On the 24th day of October, 1884, in the district court of Medina county, appellant W. D. Ward was convicted of murder of the first degree, his punishment being fixed at confinement in the penitentiary for life. This conviction was for the killing of Robert Fly. We will treat the first and third assigned errors together.

First error assigned: That the court erred in overruling the defendant's challenge for cause to the juror J. R. Scates, and compelled defendant to challenge him peremptorily. Upon his *voir dire* Scates answered: "I have talked to witnesses about the case; have strong opinions as to his guilt or innocence; have expressed those opinions. It would take good, positive and conclusive evidence of

truthful men to change my opinions," but his opinions would not influence his verdict.

Third error: In overruling defendant's challenge for cause to W. W. Bailey. Upon his *voir dire* this juror answered: "I have some opinion now as to his guilt or innocence. It would take evidence to change that opinion. I got that opinion from hearsay or general gossip. I heard about it through talk and newspapers. What I read purported to be the truth, as well as I remember it. It is a settled opinion now. If the evidence turned out as I have read it, I would be of the same opinion still. I think that opinion would not influence my verdict."

The juror Newton, on his *voir dire*, said: "I have formed an opinion as to the guilt of defendant from hearsay. It would take evidence to remove that opinion. I could discard that opinion, try the case on the evidence, but the opinion might have a bearing on me."

R. B. Ship said: "I have formed and expressed an opinion as to the guilt or innocence of the defendant. I could not discard it in going into the jury box. It would take evidence to change it. I would render a verdict upon the evidence uninfluenced by that opinion. The parties who told me were not witnesses, but told me what purported to be the circumstances and facts of the case, and may have had other conversations since then with some parties."

All of these objectionable jurors, except Bailey and Ship, when defendant's challenges for cause were overruled, were challenged peremptorily, and did not serve on the jury. Defendant, however, exhausted his peremptory challenges. That each and every one of these jurors were obnoxious to challenge for cause there can be no doubt or question.

We have had under consideration the questions presented in this record, relating to the competency of the jurors, for quite a long while; we have carefully examined and compared the authorities bearing upon this subject, with a view of making, if possible, a clearer statement of the principles of law applicable thereto than we have already done; but we are forced to concede our inability to make a clearer or more lucid exposition of the law than that already made. The opinion of Judge Clark in the Rothschild case is not only a model for style and logic, but is, we believe, exhaustive of the subject.

In support, therefore, of the position that the above named persons were incompetent because they had formed an opinion of the guilt of defendant which was calculated to influence their verdict,

we submit the following authorities: *Rothschild* v. *The State*, 7 Texas Ct. App., 540; *Burrell* v. *The State*, 18 Texas, 713; *Johnson* v. *The State*, 27 Texas, 758; *Sharp* v. *The State*, 6 Texas Ct. App., 650; *Bejarano* v. *The State*, id., 265; *Krebs* v. *The State*, 8 Texas Ct. App., 1; *Loggins* v. *The State*, 12 Texas Ct. App., 65.

There was evidence tending to show that defendant was temporarily insane, produced by excessive use of intoxicating liquors. Upon this subject the learned judge charged the jury as follows: "Temporary insanity, if caused by the immoderate and continuous use of intoxicating liquors for a long period of time before the commission of the crime, for such a period as could not in reason be said to be recent, would be an excuse for the commission of crime; but the condition of the mind must be that of some disease, the result of or engendered by the long-continued or continuous use of ardent spirits — such as *delirium tremens* as contradistinguished from that form of it called drunkenness — and not a condition of mere drunkenness or drunken frenzy; for if the long-continued use of ardent spirits has not produced some specific disease or condition of the mind coming under the general head of insanity, but has only produced drunkenness, then such a condition of the mind does not excuse one for the commission of crime."

It will be seen from this charge that the insanity, to be a defense, must be caused by the immoderate and continuous use of intoxicating liquors for a *long period of time before the commission of the crime;* — "for such a period as could not in reason be said to be recent." This charge was no doubt inspired by section 1 of the act of February 17, 1881. Now, let us suppose that the use of intoxicating liquors had been long continued and also recent: What then? Would the insanity thus produced be a defense?

We believe that the Legislature intended that, whether insane or drunk, if either be produced alone from recent use of intoxicating liquors, it will not be a defense; but, on the other hand, though there be recent use, if the prisoner had long and continuously used intoxicating liquors, and this long and continued use, aided by recent use, rendered him insane, such insanity so produced would be a defense. As there was evidence showing a long and continuous use of liquor as well as recent, this charge was calculated to mislead the jury.

Again, we are clearly of the opinion that the intention of the Legislature was correctly and concisely stated in the charge requested by defendant, which is as follows: "The defendant asks the court to instruct the jury that, if they believe from the evidence that the

defendant committed the act charged in the manner and form as charged in the indictment, still, if the jury further believe from the evidence that the defendant was in such a state of mental insanity (not produced by the immediate effects of intoxicating drink, but produced by the continued and excessive use of intoxicating liquors) as not to have been conscious of what he was doing, then they should find the defendant not guilty." The court should have given this requested instruction, and in refusing to do so erred.

Because the court erred with reference to the competency of the jurors, above discussed, and because of the error in refusing the special requested instruction, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

[Opinion delivered December 16, 1885.]