DETRO v. GULF, C. & S. F. R. CO.
(No. 70.)

(Court of Civil Appeals of Texas. Beaumont. March 23, 1916. Rehearing Denied Oct. 5, 1916.)

1. MASTER AND SERVANT ☞110, 235(5)—SAFE PLACE TO WORK—RIGHT OF SERVANT TO ASSUME.

A railroad owed its lineman riding in its engine to inspect its telegraph wires the duty to use ordinary care to furnish a safe place to work, and the lineman had the right to believe the road had performed its duty.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 214, 214½, 713; Dec. Dig. ☞110, 235(5).]

2. MASTER AND SERVANT ☞269—INJURIES TO SERVANT—EVIDENCE.

In an action for personal injuries to a railroad's lineman riding in an engine cab to inspect wires and struck in the forehead while passing bridge, testimony that there were swinging scaffolds in the bridge for purposes of painting a day before the accident was not too remote from the time of his injury for submission to the jury as to what caused such injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 912; Dec. Dig. ☞269.]

3. MASTER AND SERVANT ☞286(30)—INJURIES TO SERVANT—QUESTION FOR JURY.

In a railroad lineman's action for injury while riding in an engine cab to inspect wires, his forehead being struck and skull crushed in as the engine passed the bridge, case held for the jury under the evidence bearing on the road's negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1022; Dec. Dig. ☞286(30).]

Brooke, J., dissenting.

Appeal from District Court, Montgomery County; L. B. Hightower, Judge.

Suit by C. L. Detro against the Gulf, Colorado & Santa Fé Railroad Company. From a judgment for defendant, plaintiff appeals. Reversed and remanded.

C. W. Nugent, of Houston, and C. A. Toler, of Conroe, for appellant. F. J. & C. T. Duff, of Beaumont, and W. N. Foster, of Conroe, for appellee.

MIDDLEBROOK, J. This suit was filed in the district court of Montgomery county,

Tex., by the appellant, C. L. Detro, against the appellee, the Gulf, Colorado & Santa Fé Railway Company, for damages for injuries received while an employé of the appellee, riding on one of the engines of the appellee, with the authority and permission of the appellee, and in the discharge of the general duties of appellant, he alleging that his injuries were caused by being struck on the head by a timber or some other hard substance suspended from the top or fastened to the side of appellee's bridge over Trinity river, alleging that said timber or hard substance had been negligently and carelessly left in its position by the agents, servants, and employés of appellee railway company, and that as a result of said negligence, without fault on appellant's part, appellant was seriously and permanently injured.

Appellee answered by general demurrer and general denial, and further that settlement had been had with appellant, also that if the appellant was injured in the way and manner claimed, that the injuries were the result of his own negligence in the way and manner in which he was riding upon the engine at the time, in that he was leaning out of the same, and was guilty of contributory negligence, which was the cause of his injury.

Said cause was tried before a jury up to the conclusion of all of the testimony, at which time the court peremptorily instructed the jury to return a verdict for defendant, which was accordingly done. Motion for new trial was seasonably filed, by appellant, and was by the court overruled, and the cause is now before this court for revision.

The undisputed facts show appellant to have been on the engine of the defendant company at the time he was injured, by special permit of the company. He was division lineman for the defendant company, and it was his duty to keep up the company's telegraph wires from Beaumont to Somerville, and he was permitted to ride on the company's engine, because he could better view the telegraph wires from the engine cab, and could also communicate with the engineer readily if it became necessary for him to stop and get off to repair the telegraph wires. He was injured very seriously by something striking him in the forehead while the train was passing over Trinity river bridge, his skull being crushed in, and he was knocked back on the deck between the engine cab and the tender. He was in the performance of his duty as such lineman when he was injured.

Appellant's first and second assignments of error complain of the action of the trial court in peremptorily instructing a verdict for the defendant, asserting that the evidence was sufficient to raise the issue of negligence on the part of appellee; and, such being true, it was for the jury to determine whether the railroad company was negligent.

Article 1, § 15, of our Constitution provides that the right of trial by jury shall remain inviolate. Our Supreme Court and our Courts of Civil Appeals have continuously held that it is the province of the jury to determine questions of fact. Choate v. Railway Co., 91 Tex. 409, 44 S. W. 69; Thomas v. Morrison, 92 Tex. 333, 48 S. W. 501; Burgess v. Western Union Telegraph Co., 92 Tex. 125, 46 S. W. 795, 71 Am. St. Rep. 833.

Mr. Greenleaf, in his work on Evidence, says:

"Whether there be any evidence or not is a question for the judge; whether it is sufficient evidence is for the jury."

We quote so much of the testimony as is pertinent to this issue.

The plaintiff testified:

"I had to keep the lines and everything in repair and was subject to call at any time of the day or night to do same. I carried a pass on freight trains, engines, and all, and on all trains. I mean locomotives. I was supposed to go any time of any day, regardless of weather, whether on passing trains, freight trains, freight engines, or passenger engines; anything that run. I had been engaged in those duties for the Santa Fé Railroad Company during the year 1909, and on June 6, 1909. I came here on the 22d of March, 1908, and had been there over a year, and my duties had been the same. * * * I saw that bridge, had occasion to be there a short time before my injury, and I say I was there just a day or so before. We had a tree down on the line in this edge of the bridge, right at the bottom on a trestle. I was down there an evening or so before. There was work going on at that bridge at that time. They were painting the bridge at the time. A crew was painting the bridge. I had been over there on a car a day or so before and waved at them as I went through. Their car was at the river on the side track. It was the Gulf, Colorado & Santa Fé Railroad Company's car. There were men working for the Santa Fé Railroad * * * painting the bridge. * * * They used a swinging scaffold with ropes which was on the inside of the bridge in painting it. This scaffold was swung with ropes from the top of the bridge up and down from the top of the bridge; up and down pieces get to them, the same as painting the side of a house, and swung with ropes for them to sit on there or stand up. They would lower it or raise it up and down, just the same as painting on the side of a house. You ask me if I know how they had been disposing of the scaffolds before that for passing trains, and I say when I was there they had them laying on the bridge, taken the boards out of them, had the boards hanging up on the bridge. Those scaffolds were made out of about 2x12 big heavy plank, so they would hold them up in walking across them. They were hanging lengthwise of the bridge. I have had occasion to notice their disposition of those scaffolds, and so on, and what they would do with them when trains would be passing. Sometimes they would tie them back and lower them. Up to the time of my injury I had not known of their passenger trains in any way hurting anybody. I had no apprehension of their passenger trains hurting me in passing through there. That was the least of my thoughts. [Here written permit was identified by the witness Detro, and which is not questioned by defendant, permitting Detro to ride upon the locomotives and engines of the company.] I can remember of the approach of the Trinity river bridge on that afternoon I was hurt. When I left Cleveland I got up in the engine cab behind the engineer, and I talked with him, joked with him and laughed along.

When we got down near the river, I got down and stood in the gangway to watch my line where that tree was down, and I was standing there leaning against the side of the cab watching my line. In doing that I was in the performance of my duty. I got down from behind the engineer for that purpose to look at my work, because it was dark when I finished it, and I wanted to see what kind of a job I had done. I wanted to see if I had any more to do to it, and was standing there came up * * * to where the overhead part of the bridge. I was looking down that way, glancing down, when I came to the iron part of the bridge; I looked down the river to see what— [Here witness was interrupted by this question: Q. Right there, do you recollect of passing within the bridge? A. That is what I saw, the up and down part of it; just the up and down part.]

"The approach to the bridge is sloping. * * * The span is what we call double cross iron, and of course you look in the end through that very well. When we passed that end of the span or came to it I did not care any more about my work as I had done watched my wires. When I came to the up and down part of the bridge I had passed my trouble. I knew where the trouble was as I saw it when passing and just as I looked down to the river to see what was on the river to look, and that is the last I remember. That is as far as I can remember. The next thing I remember about anything after that was I remember I came to and looked around and I saw some little white cots around me, and people lying around. * * * I don't know what I did then, as I did not know any more for awhile. When I first came to and when I first got a gleam of consciousness, I know I was in the hospital at Temple. That was what is known as the Santa Fé hospital. * * * As to telling this jury as to what happened to me when I say I turned my head to look out on the river on that bridge, I say I hit something; my head hit something. This happened on June 6, 1909. * * * I don't know as a matter of fact, nor can I remember or tell this jury how long I was in the hospital. I can tell them what I heard but I don't know how long I was in there. * * * I don't know how long those intervals of consciousness continued from time to time. I know I would keep wanting to go home all the time, but I don't know how long that was. They would not let me get up for a long time, it seemed to me like. * * * I don't know nothing at all about the way this injury happened. I remember up to the time I got on the bridge and watching my line. When I got to the up and down part of the bridge I looked at the river, and that is all I remember. I had been to the bridge many times, and thoroughly acquainted with its location. It was a day or so before I had been hurt that I saw them painting this bridge, and saw this scaffold. I don't know whether it was a day or two days. Yes, sir; it was before the injury. It was a day or so before the injury; I was down there; and came back. According to my recollection, it was one or two days. I was down there the evening the painters were at the bridge on the side track. I did not see them painting, as I was there at night, and I finished my work after dark. I did not get there until after 6 o'clock. That was how I came to be standing up watching my lines, to see what kind of job I had done. I knew the painters were there, and I knew the manner in which they painted bridges. I knew they had their things inside and outside of the bridge, and up and down, and I knew that was their custom and the way they painted bridges. * * * You ask me if I knew they were liable to have the scaffolding hanging up there, and hanging there, and I say I did not expect them to leave them. Yes, sir; I knew that was a fact; I knew that when I started there that morning, and I knew that when I got on the bridge. My wires and cross-arms are on the north side of the track going down. They are on the left-hand side going down. I was standing behind the engineer until I got down to the river. The engineer is on the right-hand side. I was on the left-hand side when I was struck. I am sure of that, and I know that. I remember I was on the left-hand side when I was struck and I changed sides going downhill before I got to the bridge. I was standing up behind the engineer on the tank on the oil tank; that is the tender. I had been sitting behind the engineer talking to him, and I had got upon the tender and was sitting up there. There is no covering over the tender. When I was in the cab I was sitting up by the engineer over the cab. I was standing in the gangway when I changed sides. The top of the cab was over that gangway. The top of the cab comes back just over the gangway. * * * The cab is not as wide as a car. The roof of the cab is about 2 inches wider than the cab. I was not leaning way out when that thing, whatever it was, struck me. I was leaning up against * * * my shoulders on the back of the cab. My head was not away out beyond the line of this covering. I had my shoulder against the cab and my head could not be very far out. I was standing leaning against this side, against the cab, and holding my hand here. * * * I was standing leaning against the cab on the left side. The top was a little wider than where I was standing, and the engine was going this way. I was hanging this way looking up and down the line. I looked down that way, went to look in the river, and had my head that way, and I was on the left-hand side. I don't know what struck me. I never seen a thing in the world. I have no idea at all what it was. That cab was not broken in any way. I know nothing about the cab being broken. * * * The bridge over the Trinity river where I was hurt is 14 feet wide. * * * You would have to lean out almost 3 feet to hit that bridge from the engine. I judge the engine cab is about 8 feet, something like that. I never measured one, but I judge about 8 feet wide, or a little better, and if you would hang out there far enough to hit that bridge, you would have to hang out about 2½ feet. If you hit anything hanging out of the bridge that way you would fall off. You couldn't fall back in the cab like I did, leaning out 2 or 3 feet. I would say 2 feet at the least, clearance in there. If you will hang your head out there and hit anything you are not going to fall out."

Fred Walsh testified:

"My occupation at present is hostler. On the 6th of June, 1909, I was firing down on the Beaumont division for the Gulf, Colorado & Santa Fé Railroad Company. I know the plaintiff, Mr. C. L. Detro. I did not know him until that time. The first time I ever saw him to know him was that day. I will state what I saw and know about it, and briefly all I know. When I saw him he had fallen on the deck of the engine. I got down and drug him back in the deck. He was in the act of falling out of the engine when I caught him. He was on the right-hand side of the engine, and we was passing across the Trinity river at the time. When I first saw him he had fallen on the deck of the engine. I got on my engine in Conroe. At the time I saw him in crossing the river he was on the engineer's side of the engine. I don't know what hit him. I did not notice anything hanging on the bridge or anything of that sort there."

On cross-examination he testified:

"I don't know just the moment that he got down off the seat in the box; he was on the engineer's side, and I was not watching him all the time he was there. I was attending my own duties; I was looking ahead, and when he fell, of course, that attracted my attention. I

don't know the identical particular spot he fell upon or how, no more than he fell in the deck. I don't know which way he fell, whether to the right or to the left side. * * * He was on the right-hand side when he fell. He was on the right side of the engine between the engine and the tank when he fell. I had not been watching him standing there all the time. He was laying down on it after he was struck. He fell on his back and his face was up. His head was on the right side of the engine; he had·fallen down in the gangway or deck of the tank. His feet hung out. He was in the act of falling out when I caught him. His head was on the right side. He was lying down on his back. * * * Well, we were on the north end of the bridge; were just entering the north end of the bridge when he was struck. I have no independent recollection of how many feet we was on the bridge, and I don't know how much. I would not pretend to say as to how far I had gotten on the bridge, and I only know we was on the north end of it. After he was struck we never did stop running; we never did stop the train, but kept running right on. We went on to Fuqua from there. We stopped at Fuqua, and that was the first stop we made. We stayed at Fuqua possibly 15 minutes. We were running possibly 10 or 15 miles an hour when that man was struck. It did not take long to cross the bridge. When I picked him up it produced some little excitement at the time. Oh, yes, there was no doubt but what he was very badly hurt. * * * He was struck here in the forehead, apparently, as the skull was crushed, but of course I don't know just how bad he was hurt, but it was an awful looking wound. As a matter of fact it was crushed; his skull was crushed; I think so. He was not conscious any time after that. He did not seem to me. I thought he was dead. He was bleeding out of his ears and nose. He had blood all over his head. He was in a terrible condition, no doubt about that. We did not stop, but went right on. I don't remember how far it was from there to Fuqua, but I suppose it was 6 or 8 miles. I did not go on up back the road that evening any time or that night. We came back the next day. We put him upon the sand-box when we picked him up. I called the engineer and we both picked him up and put him on the sand-box. It is the box in the back of the engine we have sand in. I laid him upon the box, and the engineer called the brakeman over, and the brakeman and I both held him on the sand-box until we got to Fuqua. It was some 30 or 40 minutes after that before we got to Fuqua. We ran faster after we crossed the bridge than we were crossing the bridge. * * * He was sitting on the left-hand side of the engine. My duties and the kind of work I had to do are firing that engine. I had to keep up the steam pressure, keep water in the boiler, and I was looking after that pretty closely. I never particularly watched him all the time when he got on the side. I did not watch him at all. He could have gotten on either side, so far as Mr. Detro was concerned, if he wanted to. He could have rode all over the engine, rode in the tank and different portions of the engine, with the exception of in the cab. He never did get up in the cab. I never had seen him ·ride on that engine before; not until that trip from Conroe is the first time I ever saw him ride on it. I don't remember what time it was that I next saw this man, but it was after he came back from the hospital. I think it must have been a month and a half or two months; something like that. There was no other train there in the neighborhood as we passed there that evening. I do not remember whether there was any cars on the side track at the river or at that station or not. But I don't think there was. I am not positive about that as to whether there were or not. We did not go out there to look around for anybody, as we did not stop at all. I don't know what was going on at all, and made no investigation whatever; did not look for any.

On redirect examination he testified:

"I remember which side of the track going down that way the telegraph wires are on; they are on the left side going south."

Essex Scott, colored brakeman, testified:

"I was brakeman on that train, at the time Mr. Detro was hurt, about the 6th of June, 1909. I saw him at the time of his injury. * * * He was hanging out of the gangway on the right-hand side of the engine looking down at something seemed like underneath the engine. At that time we were going south on the bridge of the Trinity river. That is where the engine was. * * * When I saw him in that dangerous position, I halloaed to look out, but I was too far away from him to hear it. I halloaed at him (Mr. Detro). I saw him at the time he was struck. He fell back in the gangway of the engine."

On cross-examination he testified:

"I was about six cars back from the engine. * * * He was leaning out far enough to hit the bridge about the length of his arms, something like it. He hit the iron span part of the bridge. He hit the end of the bridge; the iron span of the bridge, right this end of the bridge at the north end of the bridge. He just hit the end of the bridge; the iron span of the bridge. * * * He was hanging in the gangway of the engine looking at something in this position underneath the engine, and was leaning out far enough for his head to strike the bridge when he got to it. As to whether it hit him in the middle of his forehead, well, it hit him. I could not tell you, sir, how far it is from the edge of that gangway on that locomotive out to the inside edge of that bridge, as I never heard anybody say, and never measured it. I don't know whether it is a fact that entirely across that gangway there from one side to another is not more than 8 or 9 feet, and that the cab of the engine is not more than 9 feet at the outside, as I never heard anybody say. He was swinging out with both hands. I am sure about that; he was swinging out with both hands looking at something beneath the engine, seemingly looking straight down. He was leaning out far enough for his head to hit the bridge. * * * I can't tell this jury how far it was from the inside of the gangway where he was standing out to the edge of that bridge, far enough for it to hit him in the middle of the forehead. * * * I was about six car lengths from him. The cars between me and him were flat or coal cars. There was no box cars between me and the engine. I was on the box car, but there was no box cars between me and the engine. * * * I never did see anybody get hurt on that bridge before, nor did I ever hear of anybody getting hurt on it before."

R. E. Lewis testified:

"In May and June I was working for the Santa Fé Railroad Company in the capacity of paint foreman. I was in charge of the job of painting the bridge over the Trinity river. I believe I painted it in April or May, but I don't know what time we finished work there. * * * I see from my book that part of the hands left the Trinity river bridge on the 25th of May, but the most of them left before that. When I left it I did not leave any of my scaffolding and painting paraphernalia there. I moved them to the Brazos river bridge. There was no cars or any of the paraphernalia or scaffolding or anything of that sort left there on the 6th of June, 1909."

On cross-examination he testified:

"I find a memorandum to that effect in that book. This is the only book I have with refer-

ence to that. You ask me just that one, and I say there was another sheet that went in there, No. 987, but this is the regular time book. You ask me to turn to the page and show you what refreshes my mind as to when I left there, and I say this (indicating on book) where he worked up until—you see he worked (indicating on book) up to the 9th. You ask me who was that and I say this fellow; he worked until the 9th or 7th, and was set to doing something else. That fellow was James G. Batters, and Henry Rhody worked up to the 25th. Here is the 25th right here. Here it shows he is painting the girders, the second coat, and he went to Clay to do that work there. There is something further on that matter, and this fellow was painting the second coat at the Trinity river girders, and he left there about May 26th. This man here painted the girders; he painted up to the 25th. This fellow was painting the girders the second coat, but that is the Brazos bridge. I was paint foreman, and my duty was to look after the painting. I did not stay right at one bridge all the time until it was finished, but I went to other places; from place to place. I might have left some of those matters to other men to look after. I did not stay at one bridge; when I would start the men on a bridge I would not stay until practically all that was finished up. I made this report in this book; the one I was looking at while ago, I made it while I was at work on the bridge. I did not have a foreman under me, but Mr. George was over me. That was the only paint foreman. It is a fact I would sometimes have painting going on on several bridges at one time, and I would go from one to the other looking after them generally. In a way my work was generally supervising work. I do not know just when I left the Trinity river bridge, and have no way of telling that. From there I went to the Brazos bridge. I did not have some painting going on at the Brazos bridge at the same time the work was going on at the Trinity river bridge. It was not at the same time, because the Trinity river bridge was our first job. We painted on the small jobs on the left-hand side of the river, after we painted the Trinity river bridge. Now with reference to the number of men I would use in painting those large bridges, well, we had about 6 or 7 men on the Trinity river bridge, but we had about 20 men on the Brazos bridge. * * * On the Trinity river bridge we had only 6 or 7 men. We only had one scaffold with a block and tackle at each end, and two men worked on that, and the rest of them worked where they could. Now, the scaffold was built of ropes and block and a plank about 2x10 or 12. I don't remember whether the plank was 2x8 or 2x10; it might have been a 2x12, but I don't think so, I think it was 2x10. The men would sit or stand on that scaffold and paint. The scaffold would hang right under the top girders. * * * Up and down the bridge. * * * I don't know just exactly what the space is between the uprights of the bridge, but it is somewhere between 16 and 18 feet; something like that. I don't know how wide the upright pieces of the bridge are, but something like 10 or 12 inches. At the north end of the bridge, as well as at the south end, it is a fact that the uprights of the girders of the bridge are hanging about 45 degrees and sloping up and down. That was steel. The edge of that was rather sharp; that is, cut square. It was a round square. There was no other uprights on that bridge in the inside main support of the bridge, and no obstructions inside of the bridge where the trains went. * * * The girders of the bridge were small, and they just cooned it across and painted them. * * * They would not have any scaffolding to paint these. I really do not know how high they are from the track of the bridge, but it is pretty high. I don't know how thick they are—that is, those girders that ties the bridge together across— but I think they would be about 10 inches; they are fully 10 inches across the up and down, and they are about 4 inches wide, at top and bottom. * * * A man standing on the top of an ordinary box car, the girders would miss him about 2 or 3 feet. * * * I don't know how high it is from the top of the box car, but it must be about 10 or 12 feet. The ordinary man would be nearly 6 feet tall, and you have got about 20 or 21 feet, something like that from the track to the top of the railroad bridge. * * * I don't know how wide the steel bridge across the Trinity river is from the uprights on one side to the uprights on the other. No, I hardly think it is about 14 feet wide, but I haven't the least idea how wide it is. I would say it was not."

The plaintiff, recalled, testified:

"I testified to seeing some ropes where those scaffolds hung, and they were hanging on the side, but it had been pulled up, wrapped up. They were ordinary pulleys on this rope, but I could not say how big. The ordinary block and tackle that carries with it a pulley, and most of them have hooks on them. That hook is made of iron. In fact, they are always iron hooks that accompanies the pulleys. I don't know what size pulleys they were using, or how large those pulleys and hooks were on the block and tackle that is used in such work as that on bridges on the river. I suppose, too, it was about 2 or 5 inches block. The iron would be larger than the broom stick. We use them in our work altogether, and the hooks on them is pretty heavy always. * * * I heard this negro witness, Essex Scott, testify that he saw my head hit the front upright of that bridge, that sloping upright just as I hit the north end of the bridge on the right-hand side, and I tell this jury that is not a fact. I was on the left-hand side of the engine when I was hit, and I had already passed the upright and probably was over the water. I had already passed that and was going over the water. My memory is clear up to the very point of contact with that object that hit me. There was a box car next to the tender. The first car was a box car, and he was laying upon it on the second car back. He was on the second car from the engine when we came down Rayburn Hill."

C. A. Toler testified as follows:

"I have measured the width of the steel bridge on the Santa Fé Railroad across the Trinity river lately. I measured it last Saturday. I made an accurate measurement of it as near as I could. I measured it with a 2-foot iron square, and I measured it 14 feet and 1 inch from pillar to pillar inside nearest point."

On cross-examination he testified:

"I don't know what the width of the cab of an engine is, but my idea would be about 8 or 9 feet; I said the width of the bridge was 14 feet and 1 inch, but I don't know what the width of the track is. I don't know that I have noticed how far from the track the cab of an engine goes. I don't know the width of the cab of any engine, but I would judge about 8 or 9 feet. If it was 8 or 9 feet wide, and this bridge is 14 feet wide, according to my idea, it would leave a clearance of about 2½ feet or 3 feet on each side of the engine cab. If it was 8 feet cab, it would be about 3½ feet."

Under these facts, was it the duty of the trial court to submit the case to the jury, or, are these facts so lacking in probative force, as to negligence of the appellee, that reasonable minds could come to but one conclusion, i. e., a failure on the part of the plaintiff to show negligence of the defendant? If so, the action of the trial court should

be sustained; if not, his action in instructing a verdict should be overruled, and the cause remanded.

No one testifies just what struck appellant, or what he struck, except the negro brakeman, Essex Scott. He says Detro was hanging out of the engine by both hands looking down under the engine, that Detro was on the right-hand side of the engine, and that his head struck the sloping steel beam at the approach of the bridge. Detro said he had passed this beam, and was inside the bridge; that he was on the left-hand side of the engine cab, and had his head out, and was looking at the telegraph wire where he had moved a tree off of it a day or two before, and had just turned his face, when something struck him in the forehead. After the accident, he was found on the right side of the cab. The fireman testified that the telegraph line was on the left-hand side of them. Detro positively disputed his hanging out as the brakeman said he was. It is certain that something hit him and seriously injured him. It is certain that the injury occurred while he was lawfully upon defendant's engine and on defendant's bridge. One witness says plaintiff was swinging so far out of the engine cab that his head struck the steel beam of the bridge. The other disputes this. They differ also upon which side of the cab Detro was standing. There is no controversy as to Detro's duties, and why he was on the engine. It is certain that some time shortly before the injury the railroad company was painting the bridge where appellant was injured, and that while doing so, they had scaffolds hanging in the bridge where appellant was injured. Appellant says they were there doing this work a day or two before he was injured, when he was removing the tree from the wire, and appellee's paint foreman says that he had finished and left that bridge before the injury occurred, he thinks about the 25th of May, but on cross-examination, he admitted that he did not know when they finished and left the bridge. Appellant had often passed over and through this bridge before, and was never hurt, and no other person was ever injured in passing through the bridge. The bridge is 14 feet 1 inch wide inside. If appellant was in the position he says he was, there was no negligence upon his part. If he was leaning out, as the brakeman said he was, it would be a matter of fact to be passed upon by the jury to determine whether or not he was negligent. The position and actions of the appellant at the time he was injured, as told by himself, and as told by the brakeman, are in direct dispute. In passing upon such testimony, a jury would likely take into consideration all of the surroundings and circumstances just before, at the time, and just after the accident; such as, why should Detro be on the right-hand side of the cab, or why should he be on the left-hand side of the cab? How came him on the right side of the cab when he fell? Why was he not knocked off the cab entirely if he was hanging entirely out of the cab 2 to 3 feet when he was struck, etc.? From all of the facts put together, and considered as a whole, a jury would arrive at a conclusion as to whom negligence was to be charged. It is reasonably certain that the railroad company or Detro, one or the other, was guilty of negligence.

[1] The appellee owed appellant the duty to use ordinary care to furnish appellant a reasonably safe place to do his work, and appellant had the right to believe the company had performed such duty.

If we eliminate the testimony of the brakeman, which is contradicted, we have the injured man in his proper place for work, without any explanation of what caused his injury, other than by circumstances occurring at or near the time of his injury and at the place of his injury.

It is not only unreasonable for Detro to tell what struck him, or how he was injured, but under the facts of this case it was impossible for him to do so. He was unconscious for a long period after the injury, and, while we have not quoted that specific testimony, above, he testified positively that he has never arrived at normal mental condition since his injury. The train was not stopped when he was injured. The railroad company was in control of the train, and in control of the bridge. It is certain that shortly before his injury, the railroad company had its men with swinging scaffolds in that bridge painting it. Taking into consideration plaintiff's injury, the place he was injured, which are fixed and undisputed facts, and also the testimony in dispute as to the brakeman and Detro himself as to what Detro was doing at the time he was injured, do the circumstances of painting of the bridge and the contrivances used in connection with painting the bridge at the time all of the testimony taken together shows that the bridge was being painted present a case in which reasonable minds can come to but one conclusion, i. e., that the plaintiff failed to show negligence upon the part of the defendant, and therefore he could not recover, or, viewed from another standpoint, is the time of the hanging scaffolds in the bridge too remote to warrant a deduction upon the part of the jury that they were still hanging there and caused his injury?

In the case of Pullman Palace Car Co. v. Smith, 79 Tex. 468, 14 S. W. 993, 13 L. R. A. 215, 23 Am. St. Rep. 356, issue was raised as to what caused plaintiff's illness, and she, in testifying by deposition, said:

"I know of nothing else that could have caused my illness except the exposure to which I was subjected on the morning when I got off the train."

This evidence was objected to, and the Supreme Court says there was no error in overruling defendant's objection.

In M. K. & T. Ry. Co. of Texas v. Oslin (writ of error denied) 26 Tex. Civ. App. 370, 63 S. W. 1039, both the question of contributory negligence and circumstances surrounding the injury and remoteness of time as to conditions of the railroad at the crossing where the plaintiff was injured are discussed at length by the court. Justice Templeton, writing the opinion, says:

"The only other questions presented in appellant's brief relate to the rulings of the trial court on the admission of evidence. Appellee was permitted to prove by one Williams that he passed the scene of the accident about 6 o'clock the next morning, and that a string of box cars was then standing on a side track north of and near the main track, and about 600 yards east of Myrick avenue. The testimony was admissible as tending to prove that the cars were there at the time of the accident, thereby obstructing Mrs. Oslin's view of the approaching engine. We have had occasion heretofore to express an opinion at some length upon this question, and think that a further discussion of it is unnecessary"—citing Railway Co. v. Brown, 58 S. W. 44.

There was evidence in this case that the view of one approaching the crossing, as Mrs. Oslin and her daughter were doing, was so obstructed by box cars, piles of ties, and a scrap bin, all situated so near the track as to make it difficult to discover a train coming from the east as the train was coming.

In Texas Midland Ry. Co. v. Brown (writ of error denied by Supreme Court) 58 S. W. 44, a witness by the name of Brown was permitted to testify over objection of the railroad that he examined the railroad at or near the place where Brown had testified the accident occurred early in the morning after the accident, and that he found the hole there. The pleadings and the proof was to the effect that there was a hole in the platform and the plaintiff stepped in and fell as he was in the act of getting on the train, and he attributed his accident and his injury to the unexpected moving of the train and his getting his foot in the hole in the platform. Justice Templeton, in passing upon an assignment raising error upon this issue, says:

"So far as we are informed, it is only where it is sought to introduce the proof as a confession of negligence that the courts have rejected it where it was otherwise relevant. The evidence of Nelson was not offered to prove negligence, but was offered solely as a circumstance tending to prove the condition of the platform at the time of the accident, and was limited by the charge of the court to that purpose. The accident occurred about 8 o'clock at night. Nelson made his examination about 6 o'clock the next morning, and found a hole in the platform. It is suggested that some intervening cause, occurring between the time of the accident and the time of Nelson's examination, might have produced the hole. This goes to the weight, and not to the admissibility, of the evidence."

So it will be seen that conditions existing the next morning after the occurrence of an injury the night before are not too remote.

In S. A. & A. P. Ry. Co. v. Beam (writ of error denied by Supreme Court) 50 S. W. 411, Beam was injured on July 14, 1897, in making a coupling on the pilot of an engine. Beam slipped off of the pilot in some way, and was injured, and he alleged and introduced evidence to the effect that the railroad track was out of condition, and he was jolted off of the pilot on account of the bad condition of the track. One Frank Wiggins testified as to the condition of the track in August, after the accident had occurred in July, and that he found low joints in the track. Justice Garrett, in passing upon the issue raised by proper assignment, said:

"The objection to this testimony would be rather to its weight than to its admissibility, and there was no error in receiving it."

In M., K. & T. Ry. Co. of Texas v. Parrott, 43 Tex. Civ. App. 325, 94 S. W. 1135, 96 S. W. 950, 91 S. W. 602, in speaking upon this line, the court says:

"The testimony, admission of which is complained of in the fifth and seventh assignments of error of appellant, was properly admitted. The fact that the time to which the testimony related was nine months prior to the date of the accident would only affect the weight of the testimony, and not its competency."

In Oriental et al. v. Barclay, 16 Tex. Civ. App. 193, 41 S. W. 117, it is held that evidence as to improper construction and repair of an elevator 6 months before the accident occurred was proper.

[2] So, it would seem, from these authorities, that testimony as to swinging scaffolds in the bridge a day or two before the injury to Detro would not be too remote from the time of his injury, and would be a proper circumstance to be submitted to the jury as to what caused his injury.

In Buckler v. Kneezell (writ of error denied) 91 S. W. 370, Chief Justice James gives the following special charge as a correct instruction upon circumstantial evidence:

"Direct evidence is proof of the facts by witnesses who saw the acts done or heard the words spoken. Circumstantial evidence is the proof of collateral facts and circumstances from which the mind arrives at the conclusion that the main facts sought to be established in fact existed; and if all the facts and circumstances introduced in evidence, taken together, lead your minds to the conclusion that the facts above stated existed, you will so find."

"The whole doctrine of the proof of facts by circumstantial evidence, which, while not directly establishing the fact sought to be proven, establishes other facts from which the existence of the disputed fact may be, with more or less probability, inferred, rests upon the acknowledged results of human experience." Michie's Digest, p. 165; Brewer v. Cochran, 45 Tex. Civ. App. 179, 99 S. W. 1033; writ of error refused, 102 Tex. 578.

Again:

"The circumstances which will amount to sufficient proof of a disputed fact can never be previously defined. * * * The only legal test of which they are susceptible is their sufficiency to satisfy the mind and conscience of the jury." Burrell v. State, 18 Tex. 713–715.

"When resort is had to circumstantial proof, 'any fact may be submitted to the jury, provided it can be established by competent means, which affords any fair presumption or inference as to

the question in dispute.' Wells v. Fairbank, 5 Tex. 582." Davie v. Terrill, 63 Tex. 105.

In G., C. & S. F. Ry. Co. v. Hayden, 29 Tex. Civ. App. 280, 68 S. W. 530, a defect in a lath machine was alleged, and evidence showed that when such machine was properly constructed and in proper repair the operator thereof could, when he desired to do so, bring the same to a standstill by shifting the belt onto the pulley. That when the machine, so constructed and in good repair, was properly stopped by the operator, it would remain at a standstill, and remain until started by some one; and that by the use of ordinary care such machine and appliances could be kept in good condition. The machine, from some unknown cause, started while Hayden was doing some work upon it, or with it, after he had stopped it, and the evidence showed that the machine was not started by any other person, and that it could have been started in motion by only two causes, viz.: The failure of Hayden to properly shift the belt, and, second, defect in the machine or its appliances. Appellant introduced evidence tending to show that it had used due care to keep the machinery in good repair, etc. The inspector testified that he had continuously looked over it and discovered no defect therein. The court says:

"It is significant, however, that he did not make a minute special inspection of it. He appears to have daily looked at the machine when it was in operation, and, observing no defect, concluded that it was in good condition. An examination of the shafts, pulleys, belt, and shifter, with a view of ascertaining whether the same were in proper condition and repair, as regarded the stopping and starting of the machine, appears not to have been made. The evidence warrants the conclusion that appellant, by the exercise of ordinary care, could have discovered the defect and remedied same in time to have avoided the accident."

Again the court, in its opinion, says:

"The evidence warrants the further conclusion that, on the occasion of the accident, Hayden properly shifted the belt, and that the machine was not started in motion by any act of his, or by failure on his part to use due care in stopping the machine, or in working with it after it was stopped."

It is to be noted that these conclusions are drawn from the facts not specifically testified to by any witness.

In McCray et al. v. G. H. & S. A. Ry. Co., 89 Tex. 168, 34 S. W. 95, Justice Brown, speaking for the Supreme Court, says:

"It is a general rule that when a servant sues his master or employer for damages arising from injuries caused by the negligence of the latter, the plaintiff must prove the negligence of the defendant, and that proof of the accident and injury alone will not be sufficient to authorize a recovery. However, it is well settled by authority that the circumstances attending the injury may be sufficient to establish the fact of negligence without any direct proof thereof. In the case of Railway Co. v. Crowder, 63 Tex. on page 504, Justice Stayton, after stating the general rule, says: 'There is no doubt that cases occur in which the accident is of such character as of itself, when considered in connection with the facts which necessarily appear in showing the accident, to amount to sufficient proof of the want of due care by the defendant, and of the exercise of due care by the plaintiff, to authorize a jury to find both facts, without any direct proof on either point; but this does not affect the question of burden of proof, but relates rather to the sufficiency of the evidence furnished by the accident itself. The burden of proof resting on a plaintiff upon the issues of negligence of the defendant, and his own exercise of due care requires that he should show the facts surrounding and leading to the accident, and if from these, when shown, a jury may reasonably infer negligence in the defendant contributing to the injury, and the exercise of due care by the plaintiff, then he is entitled to a verdict; but, if he does not show how the accident occurred by which he was injured, by showing his own relation to it, and the other surrounding facts, some or all of which may appear from the character of the accident itself, then he has not gone with his evidence as far as the law requires him to go to authorize a recovery.' Mr. Wharton, in his work on Negligence, § 421, having stated the general rule, says: 'But the very nature of the accident may of itself, and through the presumption it carries, supply the requisite proof.' In Shear. & R. Neg. § 59, the author, having likewise stated the general rule upon the subject, continues: 'In many cases the maxim "res ipsa loquitur" applies. The affair speaks for itself. It is not that in every case negligence can be assumed from the mere fact of the accident and of injury, but in these cases the surrounding circumstances, which are necessarily brought into view by showing how the accident occurred, contained, without further proof, sufficient evidence of the defendant's duty and of his negligence to perform it. The fact of the casualty and the attendant circumstances may themselves furnish all the proof of negligence that the injured person is able to offer, or that it is necessary to offer.'"

See this case and the authorities cited in it for an extended discussion of the proposition of circumstantial evidence. In that case the trial court instructed a verdict, the Court of Civil Appeals upheld the action of the trial court, and the Supreme Court reversed and remanded the case for a new trial.

Quoting from Rose v. Transportation Co. (C. C.) 11 Fed. 438, in this opinion, Justice Brown says:

"It is contended, however, that it was error to instruct the jury that they might infer such negligence from the fact of explosion, and it is argued that such a presumption only obtains when the defendant is under a contract obligation to the plaintiff, as in the case of common carrier or bailee. Undoubtedly, the presumption has been more frequently applied in cases against carriers of passengers than in any other cases of negligence, but there is no foundation in authority or in reason for any such limitation of the rule of evidence, as the presumption originates from the nature of the act, not from the relations between the parties. It is indulged as a legitimate inference whenever the occurrence is such as, in the ordinary course of things, does not take place when proper care is exercised, and is one for which the defendant is responsible."

In the instant case, Detro had no way of examining to find out what struck him. It is to be noted also that the engineer who was handling the engine never testified, nor is there anything in the record to show why he did not testify.

[3] Without laying any stress upon any of the evidence in the case, as deduced upon the trial, or any suggestion of its probative

force, we think, under the pleadings and the proof, as is presented in the record, the case should have been submitted to the jury, for its determination, and that the able trial court committed error in peremptorily instructing a verdict for the defendant.

So believing, it is ordered that the cause be reversed and remanded for a new trial.

Reversed and remanded.

BROOKE, J. I can find no evidence in the record of any character showing negligence on the part of the defendant company. Therefore I cannot agree with the majority of the court in the disposition of the case, and file this, my dissent.

---

⊕⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes